**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Dennis Lee ULLRICH,**
**Defendant-Appellant.**

No. 77–5038.

United States Court of Appeals,
Fifth Circuit.

Sept. 20, 1978.

Louis M. Jepeway, Jr., Miami, Fla., for defendant-appellant.

Jack V. Eskenazi, U. S. Atty., Don R. Boswell, Asst. U. S. Atty., Miami, Fla., for plaintiff-appellee.

Before BROWN, Chief Judge, GEWIN and TJOFLAT, Circuit Judges.

TJOFLAT, Circuit Judge:

The appellant, Dennis Ullrich, was convicted by a jury in the district court of transporting a stolen motor vehicle in interstate commerce, in violation of the Dyer Act, 18 U.S.C. § 2312 (1976). Ullrich raises multiple grounds that he contends require his conviction to be overturned. First, he argues that the evidence utilized by the government to convict him was obtained as a result of a search incident to his allegedly unlawful arrest by a Florida police officer. Second, he contends that the district court committed reversible error in admitting two Government exhibits offered to establish the identity of the automobile and its accessibility to Ullrich for the alleged theft. Third, he asserts that a lineup ordered by the district court during his trial was impermissibly suggestive.

We hold that the search incident to Ullrich's arrest was valid and that the district court properly denied Ullrich's motion to suppress the evidence obtained through the search. There was no error in the admission of the Government exhibits in question, and any error that may have occurred in the in-court lineup was harmless. Accordingly, Ullrich's conviction is affirmed.

I

On the evening of February 5, 1976, Officer Robert Albert Van Reeth, who at that time had been employed by the West Palm Beach, Florida, Police Department for approximately five months and had made numerous felony and misdemeanor arrests, was contacted by a security guard of Richard's department store while the officer was patrolling the Palm Beach Mall. Two of the salesclerks at Richard's had notified the security guard that a male customer had used a stolen credit card. The customer, who had purchased two items for less than fifty dollars each and had signed sales receipts for the purchases, was to return to the store at closing time, a short while later, for a social engagement with one of the salesclerks. The salesclerks gave the officer a description of the customer.

Officer Van Reeth, who was patrolling without a back-up officer, decided to investigate. He waited outside the store for the suspect to return. When Ullrich drove into the parking lot, both the salesclerks and the security guard pointed him out to the officer. Officer Van Reeth followed him in his patrol car, put on his flashing blue lights, and had Ullrich stop his automobile. Officer Van Reeth approached the automobile and, while standing outside the driver's side, asked Ullrich for identification. Ullrich procrastinated, then reached for his glove compartment with one hand while reaching under the front seat with the other. This movement was construed by the officer as threatening; he removed Ullrich from the automobile, frisked him, and placed him in the secured back seat of the patrol car. Officer Van Reeth then returned to the automobile and checked under the front seat to determine what was there. He found a revolver secured in a holster. At that point the officer returned to Ullrich, told him he was under arrest for carrying a concealed weapon, and read him his

rights as required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Officer Van Reeth also called for a supervisor.

The officer then returned to the open car to see whether the keys were in the ignition. As he got into the driver's seat, he observed a glassine bag containing various pills on the passenger's seat. Numerous credit cards were clearly visible in the glove compartment, which Ullrich had left open. The officer noted about four different names on the cards. At some time while at the scene of the arrest, Officer Van Reeth noted the vehicle identification number on the automobile, a 1976 Lincoln Continental. He also ran an initial check on the automobile's Ohio license tags, but it did not show the automobile to be wanted.

Officer Van Reeth waited with the defendant until a second police unit arrived. Following a written policy of the West Palm Beach Police Department, the officers impounded the vehicle and took it to the police station, where it was examined. By then the investigation had been taken over by Detective Sergeant John Conklin. Sergeant Conklin examined the contents of the automobile, including the contents of the open glove compartment. He interviewed and took the statements of the witnesses from the department store. Approximately two hours after the arrest, he saw Ullrich and, after obtaining a waiver of *Miranda* rights, interviewed him. Sergeant Conklin questioned him on the ownership of the car. Ullrich stated that the car belonged to a friend but did not give the friend's name. When Sergeant Conklin requested the friend's telephone number, to verify Ullrich's authority to have possession of the automobile, Ullrich said that his friend did not have a telephone. To identify the owner, Sergeant Conklin contacted the factory

and discovered that the automobile had been shipped to a Lincoln Mercury dealer in Dayton, Ohio. When Sergeant Conklin telephoned the dealer, it was discovered that the automobile was missing from the dealer's lot. The federal authorities were promptly notified, and the Dyer Act charge now before us was instituted.

Ullrich contends that his arrest by Officer Van Reeth for carrying a concealed weapon was invalid under Florida law and that the evidence obtained from the search of the automobile should have been suppressed. The evidence included, among other things, the vehicle identification number observed by Van Reeth at the scene of the arrest, a false Ohio certificate of title, and other papers purporting to demonstrate that the automobile was properly registered in Ohio. Ullrich argues that without this evidence the Government could not have obtained his conviction.

[1] At the outset, we should note that the Government challenges Ullrich's standing to protest the search of the automobile. Under the case law of this circuit, a defendant has automatic standing to contest the search of a vehicle when he is charged with a violation of the Dyer Act, 18 U.S.C. § 2312 (1976). *Williams v. United States*, 412 F.2d 729 (5th Cir. 1969); *Glisson v. United States*, 406 F.2d 423 (5th Cir. 1969) (overruled on other grounds, *United States v. Johnson*, 431 F.2d 441 (5th Cir. 1970) (en banc)). *But see United States v. Edwards*, 577 F.2d 883 at 895–96 (5th Cir. 1978) (en banc) (Brown, C. J., concurring in part and dissenting in part) (Tjoflat, J., concurring specially) (both calling for rejection of the automatic standing concept). Therefore, we must hold that Ullrich has standing.[1]

---

1. The Government urges that *Williams* and *Glisson* misapplied the Supreme Court's holding in *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). In *Jones*, the defendant was legitimately on the premises; here, Ullrich never claimed to have been lawfully in the automobile at the time it was searched. The offense in *Jones* was possession of narcotics. For the defendant to have admitted the possession in order to have standing would have virtually convicted him; therefore, the Supreme Court corrected the dilemma by granting automatic standing to the defendant. In Ullrich's case, the opposite is true: if Ullrich had been able to show that he was in the vehicle legally, he would have disproved the Government's contention that he never had legal possession of the vehicle.

Turning then to the question of the validity of Ullrich's arrest, we start with our holding in *United States v. Wynn*, 544 F.2d 786, 788 (5th Cir. 1977): when an arrest is made by state officers acting pursuant to state authority, "the requisite standard of probable cause for a lawful arrest is determined by state law, provided such law meets federal constitutional standards." *See United States v. Di Re*, 332 U.S. 581, 68 S.Ct. 222, 226, 92 L.Ed. 210 (1948). The Florida Supreme Court has defined the test for a valid warrantless arrest as being "what a reasonable man would have believed had he known all of the facts known by the officer." *State v. Outten*, 206 So.2d 392, 397 (Fla.1968). Accord, *Canney v. State*, 298 So.2d 495 (Fla. App.1973), *cert. denied*, 310 So.2d 743 (Fla.), *cert. denied*, 423 U.S. 892, 96 S.Ct. 188, 46 L.Ed.2d 123 (1975); *Chaney v. State*, 237 So.2d 281 (Fla.App.), *cert. denied*, 242 So.2d 461 (Fla.1970), *cert. denied*, 403 U.S. 904, 91 S.Ct. 2205, 29 L.Ed.2d 680 (1971). The test is the same under the fourth amendment. *E. g. Beck v. Ohio*, 379 U.S. 89, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964); *Brinegar v. United States*, 338 U.S. 160, 69 S.Ct. 1302, 1310–11, 93 L.Ed. 1879 (1949). Therefore, to determine whether Ullrich's arrest and the search incident to it were reasonable under Florida law and the federal Constitution, we must review the facts known to Officer Van Reeth at the time of the arrest. *See South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 3099, 49 L.Ed.2d 1000 (1976) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 2059, 29 L.Ed.2d 564 (1971)).

When Officer Van Reeth decided to stop and question Ullrich, the officer had been informed by the department store personnel that the suspect had made two purchases with a credit card that had been reported stolen. The salesclerks not only gave a physical description of the customer but also pointed him out to the officer. Prior to stopping the suspect, the officer may have considered his conduct to constitute a misdemeanor under Florida law.[2] Record, vol. 1, at 401. State Credit Card Crime Act, Fla.Stat. §§ 817.57–.68, §§ 817.-60(1), 817.61 (1975). Florida law does not authorize an officer to make a warrantless arrest for a misdemeanor unless it was committed in his presence, Fla.Stat. § 901.15 (1975), but it does permit him to stop and briefly detain a suspect under the state's "stop and frisk" law, *id.* Clearly, Officer Van Reeth was acting reasonably and lawfully in making the initial stop and asking Ullrich for identification.[3]

When the suspect procrastinated before opening the glove compartment and then simultaneously reached under the seat of the car, Officer Van Reeth's responses to what he considered a threatening motion were manifestly reasonable. The Supreme Court has repeatedly acknowledged the dangers facing police officers when they approach persons suspected of crimes. The Court has also repeatedly stated that an officer may take reasonable steps to ensure his safety. *See Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330, 333 & n. 6, 54 L.Ed.2d 331 (1977); *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972); *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 1881, 20 L.Ed.2d 889 (1968). When we take into account that Van Reeth was not accompanied by another police officer, we cannot conceive of a course of action that could have been more reasonable than frisking the suspect and securing him in the back seat of the patrol car, where no bodily harm could result, before checking under the front seat of the automobile for a weapon. This conduct was nothing more than the final act in the consummation of a *Terry* stop. *Cf. Canal Zone v. Bender*, 573

---

**2.** The officer testified, however, that he knew that it is a felony under Florida law to forge another person's name to a sales receipt. Record, vol. 1, at 421.

**3.** The officer testified that he hoped his investigation would result in Ullrich producing the credit card, which would constitute the crime of possession of stolen property. Record, vol. 1, at 424. This of course would be a crime committed in the officer's presence, and Officer Van Reeth could have effected an arrest on that ground.

F.2d 1329, 1331–32 (5th Cir. 1978) (search of automobile invalid where officer had no grounds to believe his safety in danger). When Officer Van Reeth discovered the holstered revolver, the stop ended, and Ullrich was formally arrested for the felony of carrying a concealed firearm.

■ Ullrich's argument is that his arrest for carrying a concealed weapon was invalid under Florida law and therefore unreasonable. Under Fla.Stat. § 790.01 (Supp. 1976), it is a crime to carry a concealed weapon. Ullrich contends, however, that a recent construction of that statute by an intermediate Florida appellate court has rendered that statute inapplicable in cases like his where the concealed weapon is secured in a holster and is carried in an automobile. *See State v. Hanigan,* 312 So.2d 785 (Fla.App.1975). *But cf. State v. Butler,* 325 So.2d 55 (Fla.App.1976) (refusing to adopt rationale of *Hanigan* ). We pretermit the issue whether, under Florida law, the opinion of that appellate court precluded the possibility that Officer Van Reeth had probable cause to believe that Ullrich had committed the offense of carrying a concealed weapon.[4] It is unnecessary for us to reach this issue because Officer Van Reeth could have arrested Ullrich for another felony.

■ At the time of the initial stop, Officer Van Reeth had information that the suspect had signed the sales receipts for the purchases at Richard's department store. Under Florida law, using a stolen credit card and signing another person's name to the sales receipt could be prosecuted under either the State Credit Card Crime Act, Fla.Stat. §§ 817.57–.68 (1975), or the general forgery statute, Fla.Stat. § 831.01 (Supp. 1976). *See Fayerweather v. State,* 332 So.2d 21 (Fla.1976); *McConnell v. State,* 298 So.2d 550 (Fla.App.1974). Forgery was and is a felony in Florida. Fla.Stat. § 831.01 (Supp.1976). A police officer could make a warrantless arrest for a felony, even if not committed in his presence. Fla.Stat. § 901.-15 (1975). It is settled Florida law that the validity of an arrest does not turn on whether the arresting officer charges the arrestee with a misdemeanor if the officer could have arrested him for a felony. *Chaney v. State,* 237 So.2d 281 (Fla.App.), *cert. denied,* 242 So.2d 461 (Fla.1970), *cert. denied,* 403 U.S. 904, 91 S.Ct. 2205, 29 L.Ed.2d 680 (1971).[5]

■■ As we noted above, after formally placing Ullrich under arrest, Officer Van Reeth returned to the car, to determine whether the keys were in the ignition so

---

4. In *Hanigan,* the District Court of Appeal construed the exception from the licensing requirements that permits the carrying of a securely holstered revolver in a private conveyance, Fla. Stat. § 790.25(3)(*1*) (1975), to except also such conduct from the prohibition against carrying a concealed weapon, Fla.Stat. § 790.01 (Supp. 1976). In Ullrich's prosecution on the state charges arising out of this incident (it is unclear from the record what the charges were, but they apparently included carrying a concealed weapon, possession of drugs, and possession of stolen credit cards), the Florida trial court held that the gun had to be suppressed under *Hanigan.* The state court found that Ullrich did not have standing to suppress the credit cards and narcotics found in the automobile. The question of suppressing the automobile itself was held moot because the automobile was the subject of this prosecution, then pending. Record, vol. 1, at 472. On a motion for reconsideration, heard by the state court *after* Ullrich's trial in federal court, the state court suppressed the credit cards and narcotics, as fruits of a search incident to an illegal arrest. The issue whether the automobile itself should be suppressed was

again held moot. 1st Supp. Record vol. 1, at 1. Ullrich's state prosecution was nolle prossed as a result of the Florida trial court's rulings. The state did not appeal.

Ullrich erroneously contends, here, that the state trial court's suppression of the fruits of the search of the automobile binds us. That is not the teaching of *United States v. Wynn,* 544 F.2d 786 (5th Cir. 1977). See text following note 1 *supra.* We are bound to apply Florida's standard for a warrantless arrest, not to adopt the holding of a Florida trial court, especially a holding occurring after a trial in federal district court.

5. In *Chaney v. State,* the defendant was arrested for damaging telephone equipment, a misdemeanor. At the time of the arrest, however, there was probable cause to arrest him for possession of burglary tools, a felony. In reviewing his habeas corpus proceeding, this court also held the search incident to Chaney's arrest valid. *Chaney v. Wainwright,* 460 F.2d 1263 (5th Cir. 1972).

that the car could be impounded. His return was in keeping with the written policy of the West Palm Beach Police Department and Supreme Court precedent.[6] *See Cooper v. California,* 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967). Knowing that a gun (which happened to be the object of the concealed weapon arrest) was in the open car made it imperative that the officer secure the vehicle as part of his "community caretaking functions." *See Cady v. Dombrowski,* 413 U.S. 433, 93 S.Ct. 2523, 2528, 37 L.Ed.2d 706 (1973). Moreover, the narcotics and credit cards seen by the officer could have been seen by anyone passing by. *See generally South Dakota v. Opperman,* 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976); *United States v. Piatt,* 576 F.2d 659 (5th Cir. 1978).

In sum, the district court correctly denied Ullrich's motion to suppress. The police officer's error in not charging Ullrich with the felony at the moment of the arrest did not make the subsequent search of the automobile unreasonable.

## II

During the course of Ullrich's trial in the district court, the Government called Albert Siewe, the general manager of Don Kremer Lincoln Mercury Agency. Mr. Siewe testified that he knew Ullrich because Ullrich had negotiated for the purchase of a new Lincoln Continental Mark IV from the automobile dealership in the fall of 1975. Record, vol. 2, at 99. He also testified that the dealership had never sold or delivered a new automobile to Ullrich; Mr. Siewe had cancelled the order. *Id.* at 100–101.

Through Mr. Siewe, the Government introduced two exhibits: an inventory schedule and a manufacturer's statement of origin (MSO). These documents were used by the Government to establish that the automobile in Ullrich's possession at the time of his arrest was one that had been stolen from the automobile dealership. Ullrich contends that the Government did not establish a proper foundation for the admission of the exhibits because they were not prepared by the automobile dealership. The inventory schedule was in the form of a computer printout, which was prepared by Ford Motor Credit Company. The MSO was sent to the dealership with the automobile by Ford Motor Company.

Although these documents were furnished originally from other sources, Mr. Siewe testified that they were kept in the regular course of the dealership's business. In effect, they were integrated into the records of the dealership and were used by it. Ford Motor Company is the floor-plan financier for the automobiles on the dealership's lot. Large sums of money are borrowed by the dealership; the automobiles, identified by item and serial numbers, serve as collateral. A representative from Ford Motor Credit Company would use the inventory schedule periodically to confirm the presence of the collateral on the lot by inspecting the cars, by serial numbers. In this manner, differences in inventory could be resolved. Record, vol. 2, at 111. The inventory schedule is used by the dealership to cross check the amount of interest paid to Ford Motor Credit Company. *Id.* at 110. The schedule is also employed as a record disclosing whether particular automobiles have been sold, sent to another dealership, or remain in inventory. *Id.* at 111. It is an accounting document in the dealership business. *Id.* at 130. The inventory schedule admitted by the trial court demonstrated that the automobile in question became the

---

**6.** Ullrich claims that the impoundment was improper under Florida law. He cites cases that state that an automobile must not be impounded if the arrestee protests the impoundment, *Weed v. Wainwright,* 325 So.2d 44 (Fla.App. 1975), *cert. denied,* 336 So.2d 605 (Fla.1976), and that one arrested for a traffic violation must be given the options either to leave the automobile where it is or to have a passenger move the vehicle, *e. g., Chuze v. State,* 330 So.2d 166 (Fla.App.1976). These cases clearly do not apply in the context of this arrest. Here, there has been no showing that Ullrich protested the impoundment at the time. Moreover, the police officer knew that the unlocked automobile, which was in a public place, contained contraband. This impoundment and inventory search were proper under Florida law. *See State v. Jenkins,* 319 So.2d 91 (Fla.App. 1975).

property of the dealership on November 8, 1975. *Id.* at 133.

An MSO is a form of title to an automobile. It is itemized by a stock number, which is assigned by the dealership and is cross-referenced to the dealership's master log. *Id.* It is filed in the dealership's safe until the automobile is transferred or sold.[7] At that time, the MSO is signed on the reverse side by an agent of the dealership and submitted to the Ohio Title Bureau for an initial title to the automobile. The original MSO is retained by the title bureau for its records. *Id.* at 113. A certified copy is filed in the dealership's records. *Id.* at 116.

■ We think it obvious that these documents are admissible as business records under Fed.R.Evid. 803(6). They are records transmitted by persons with knowledge and then confirmed and used in the regular course of the dealership's business. We also consider the documents to have been authenticated properly under Fed.R. Evid. 901. They have all the indicia of trustworthiness that the federal rules require for the admission of hearsay evidence. There was no error in the admission of the documents.

### III

The Government also called Myra Jane Hangar, an employee of the Kettering, Ohio, License Agency for the Ohio Bureau of Motor Vehicles. On January 17, 1976, Ms. Hangar had issued the license plates for the automobile in question and the registration that Sergeant Conklin removed from the glove compartment during the inventory of the automobile following Ullrich's arrest. Approximately one month after she issued the registration, Ms. Hangar was shown a photo spread of different individuals, one of whom was Ullrich, and she could not identify him.[8] At the same time, she gave a physical description of the man to whom she had issued the registration[9] and stated that she remembered the incident because there was an irregularity in the title of the automobile.[10]

■ Before Ms. Hangar entered the courtroom to take the stand, the defense made a timely motion to suppress her identification testimony on the ground that she could not recognize Ullrich as the person to whom she had issued the registration and license plates. To determine whether Ms. Hangar could identify Ullrich, the district judge ordered an in-court lineup. In the absence of the jury, Ullrich was removed from the courtroom and Ms. Hangar was brought in and questioned about her recollection of the incident. Then the defendant and five other men, chosen from those who happened to be in the building, walked into the courtroom and stated, "My name is Bill Brown." Though nine months had passed since she had issued the registration, Ms. Hangar picked out the defendant from the lineup, but she qualified her choice by indicating that she was not certain.[11] After

---

7. If an automobile is not physically present on the dealership's lot, for example, because it is being test driven by a potential customer, the dealership presents the MSO to Ford Credit Company to verify ownership.

8. When, during the prosecution's case, the district judge was required to examine the photo spread, he stated, "I could not recognize the defendant from one of these pictures." Record, vol. 2, at 184.

9. The description, later repeated by Ms. Hangar at trial, was that "he was approximately five, eight and medium build and from blond to brown hair—it is in between." Record, vol. 2, at 196–97. She also testified at trial that he was "in his 30's, early 30's." *Id.* at 223.

10. In order to obtain an Ohio registration and license plates, the title to the automobile must be presented to the state license agency. Another Government witness, a deputy chief of clerks of the Ohio title department (an office separate and apart from where Ms. Hangar worked), testified that the certificate of title found in the glove compartment of the automobile in question was one that she had noted as missing from her office on February 25, 1972. Record, vol. 2, at 240–43.

11. Ms. Hangar stated in part as follows:

"I cannot say to a 100 degree, you know. . . .

"It is hard for me to answer that because he looks like the person, yes, but I cannot—he definitely looks like him, yes."
Record, vol. 2, at 209.

full voir dire examination by the court and counsel, Ms. Hangar left the courtroom. Ullrich then formally objected to the lineup as impermissibly suggestive, because the other members of the lineup did not resemble him or the description given by the witness, and reiterated his objection to the witness attempting an identification of him in the presence of the jury.[12] The objection was overruled, and the trial resumed with Ms. Hangar on the stand. The prosecutor then recreated the lineup, and the witness picked out Ullrich as the man to whom she had issued the registration and license plates. Later, in the jury's absence, the district judge ordered a photograph taken of the lineup and entered the photograph into the record as a court exhibit.[13] Record, vol. 2, at 357.

Ullrich contends that this court-ordered lineup was so impermissibly suggestive that it constituted a denial of due process. See, e. g., Foster v. California, 394 U.S. 440, 442, 89 S.Ct. 1127, 1128, 22 L.Ed.2d 402 (1969); United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). He claims on appeal, as he did in the district court, that the other men in the lineup were significantly physically dissimilar to him and to the description given by the witness months earlier to the FBI.

As we have stated recently, "[T]he disparate physical appearances of the lineup participants is not alone sufficient to warrant a finding of suggestiveness." Swicegood v. Alabama, 577 F.2d 1322 at 1327 (5th Cir. 1978) (citing Caver v. Alabama, 537 F.2d 1333 (5th Cir. 1976), cert. denied, 430 U.S. 910, 97 S.Ct. 1183, 51 L.Ed.2d 587 (1977); United States ex rel. Pella v. Reid, 527 F.2d 380, 384 (2d Cir. 1975); United States v. Reid, 517 F.2d 953, 965–66 n. 15 (2d Cir. 1975); United States v. Jackson, 166 U.S. App.D.C. 166, 172, 509 F.2d 499, 505 (1974)). Even assuming the admission of Ms. Hangar's testimony was erroneous, however, we hold that it was harmless. Under the Dyer Act, possession of a stolen automobile in another state creates an inference of guilty knowledge. See United States v. Smith, 502 F.2d 1250, 1254 (5th Cir. 1974) (quoting Wilson v. United States, 162 U.S. 613, 16 S.Ct. 895, 898, 40 L.Ed. 1090 (1896)); United States v. Robertson, 417 F.2d 873 (5th Cir. 1969). Here, there was the additional evidence provided by Mr. Siewe, general manager of the automobile dealership, linking Ullrich to the automobile while it was in Ohio. See part II infra. An acquaintance of Ullrich, Thomas Whittamore, testified

---

12. See note 9 supra for the description given by Ms. Hangar of the man to whom she issued the automobile registration and license plates. The defense had Ms. Hangar describe the members of the lineup for the record. In summary, she testified as follows:
    (1) 5′ 10″, black hair, medium build, 50 years old;
    (2) 5′ 8″, black hair, medium build, 40 years old;
    (3) 5′ 8″, brown to blond hair, medium build, in his 30's [the defendant, Ullrich];
    (4) 5′ 10″ or 11″, brown, dark brown hair, medium build, in his late 50's;
    (5) 5′ 7″ or 8″, graying brown hair, medium build, in his 60's;
    (6) 5′ 9″, black hair, medium build, in his late 40's.
    Record, vol. 2, at 223–26. The district judge made conflicting statements. At one point, he stated, "I cannot say that they have a real similar appearance . . .." Id. at 189. Later, however, in denying the defense's motion to suppress Ms. Hangar's testimony, he stated "I do not . . . recognize any infirmity [in the lineup]." Id. at 212.

13. This photograph was lost by the Government as the case was being prepared for this appeal. Without this photograph, Ullrich urges, the issue cannot be reviewed properly. See Hardy v. United States, 375 U.S. 277, 84 S.Ct. 424, 11 L.Ed.2d 331 (1964). We cannot agree. The transcript of the trial provides ample descriptions and comments by the witness, counsel, and the district judge.

    We think this situation is analogous to the cases dealing with violations of the Court Reporter Act, 28 U.S.C. § 753 (1976). See, e. g., United States v. Selva, 559 F.2d 1303 (5th Cir. 1977). Although there was no statutory violation here, the same analysis is applicable. When a portion of a record is lost through no fault of the defendant, he should not be made to bear the burden of the loss. Where, as here, a criminal appellant is represented by the same attorney who represented him at his trial, there must be a showing of specific prejudice from the loss of the record. Considering the record as a whole, we cannot deem the missing photograph a "substantial and significant portion of the record." Id. at 1306.

that he saw papers in the name of Charles L. Lewis in the glove compartment of the automobile. When Whittamore questioned Ullrich about the papers, Ullrich replied, "You can get papers to a car." Record, vol. 2, at 151. Charles L. Lewis was called as a Government witness, and testified that the credit cards in his name were his, but had been missing from his home since December, 1975. *Id.* at 176. He never purchased the automobile in question nor had he obtained title or license plates for it. *Id.* at 171–72. Clearly, the evidence overwhelmingly supports the jury's verdict.

AFFIRMED.