Thomas E.Q. WILLIAMS,
Appellant–Defendant,

v.

Debbie HITTLE and Gloria Brown,
Appellee–Plaintiff.

No. 29A02–9207–CV–329.

Court of Appeals of Indiana,
Second District.

March 7, 1994.

Rehearing Denied April 12, 1994.

Transfer Denied July 29, 1994.

James C. Spencer, Indianapolis, for appellant-defendant.

John Robert Hill, Greenfield, for appellee-plaintiff.

SULLIVAN, Judge.

Thomas E.Q. Williams appeals a jury award of $30,000.00 in damages to Debbie Hittle and Gloria Brown (hereinafter collectively referred to as "the Lessees") in their breach-of-lease action against Williams. Williams presents the following issues for review:

I. Whether the trial court erred in admitting into evidence financial statements prepared by someone other than the lessees;

II. whether the trial court erred in refusing to give a defendant's instruction dealing with subleases;

III. whether the jury's finding of liability against Williams was supported by the evidence;

IV. whether the damage award was excessive; and

V. whether the jury finding against Williams upon his counterclaim was erroneous?

We affirm.

The facts favorable to the judgment are as follows: On December 20, 1986, Hittle and Brown signed a three-year lease by which they were to rent office space from Williams for the purpose of opening a hair care salon called "A Step Ahead". The lease provided that the Lessees could not sublet without Williams' written consent, and that Williams was responsible for making all necessary repairs to the structure, including the roof.

The salon opened for business in January 1987 and by the summer of that year four beauticians were working in the salon, including Hittle and Brown. A fifth beautician was hired in the spring of 1988 because of the increasing number of customers. On December 15, 1987, a storm severely damaged the roof of the building in which the salon was located, and also caused damage to the inside of the salon, necessitating a shut-down of the business for five days. On the day of the storm, Hittle and Brown informed Williams of the damage to their salon and, following a personal inspection, he assured them that he would have the damage repaired. Williams hired a Mr. Tweedy to repair the roof, and repair work commenced immediately. The salon reopened for business "a few days" later, after Williams assured the Lessees that the damage had been repaired. Record at 375.

The repairs which had been made, however, were ineffective. Thereafter, whenever it rained or snow melted, water leaked through the roof and soaked the insulation above the ceiling tiles. The saturated insulation would then break through the ceiling and fall into the salon. In addition, water ran down the walls and into light fixtures located in the ceiling. The Lessees informed Williams "on quite a few occasions" (Record at 392) of the ongoing problem, and he repeatedly assured them that it would be taken care of.

As a result of the condition of the building, Hittle and Brown arrived at the salon early each day in order to repair any damage that had occurred since the salon last closed. They were also occasionally forced to rearrange the equipment in their salon in order to work in a location where the ceiling would not or had not collapsed. The Lessees persisted in requesting that Williams repair the roof, and he responded "many times" that he would take care of the problem. Record at 418. Yet, following the initial repairs immediately after the storm, the Lessees did not see anyone perform repairs upon the roof. The only repair work done on the building by someone other than Williams, Hittle, Brown, or their husbands was done by a person who visited the salon "10 or 15 times" in the fall

and winter of 1988 in order to replace ceiling tiles. Record at 413–14.

Business began to decline in the fall of 1988 until, in November of 1988, a portion of the ceiling fell on two customers. The Lessees informed Williams that, as a result of the condition of the building, their business had suffered to such an extent that they would be forced to close the salon permanently on December 24, 1988.

On February 7, 1990, the Lessees brought the instant action against Williams seeking damages allegedly resulting from the condition of the roof. Williams counterclaimed, alleging that Hittle and Brown breached the lease by failing to pay rent between the date they vacated the building and the date of the expiration of the lease.

## I. *Financial Statements*

Hittle and Brown introduced into evidence the following five exhibits: 1) Exhibit 8 was the 1987 financial statement for A Step Ahead, and was prepared by Ron Dezelan of the Kemper C.P.A. Group for the purpose of assisting Hittle and Brown in preparing taxes for A Step Ahead; and 2) Exhibits 4, 5, 6, and 7 consisted of the 1988 quarterly financial statements for A Step Ahead. These statements also were prepared by Kemper and were based upon materials provided by the lessees and similar to those used in preparing Exhibit 8. Williams objected to the exhibits upon hearsay grounds. The court admitted the exhibits under the business records exception to the rule against hearsay.

### A. *Elements of Admissibility*

■ The financial statements prepared by Dezelan are admissible under the business-record exception to the hearsay rule, Fed. R.Evid. 803(6).

Although at the time of the trial judge's decision, Indiana had not yet adopted the federal rule, Indiana has long recognized the common-law version of the business-record exception. *See, e.g., Wells v. State* (1970) 254 Ind. 608, 261 N.E.2d 865. Over the years, Indiana has used various forms of the common-law rule, with different courts requiring the proponent to prove different foundational facts.[1] Whatever the formulation, the "heart" of the Indiana rule is that "the observation, reporting, and the recording of the facts *all* be made by someone in the regular course of the business" in order to ensure the reliability of the record. *Id.,* 261 N.E.2d at 870 (emphasis in original).

Even though, at the time this evidence was admitted, Indiana had not yet adopted the Federal Rules of Evidence, the financial statements in question would clearly be admissible under federal law. Our adoption of the Federal Rules, effective January 1, 1994, places the judicial imprimatur of Indiana upon the admissibility of such evidence. It would seem incongruous to reverse the trial court's ruling merely because the specific phrasing of Rule 803(6) was not yet in place. Furthermore, very recently in a criminal appeal setting, our Supreme Court held that the newly adopted Indiana Rules of Evidence are applicable to cases pending upon appeal at the time of adoption. *Wickizer v. State* (1993) Ind., 626 N.E.2d 795. This case falls within that category.

Fed.R.Evid. 803(6) reads as follows:

"A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified

---

1. Cases as recent as 1989 have stated that the proponent must show that the record is the original or first permanent entry. *Weisman v. Hopf–Himsel, Inc.* (1989) 1st Dist.Ind.App., 535 N.E.2d 1222. However, the Indiana Supreme Court held in 1970 that this requirement had been modified to allow the admission of duplicate copies of original records. *Wells, supra,* 261 N.E.2d at 871.

In discussing whether the Indiana common-law rule required the proponent to show that the person with actual knowledge of the recorded information was unavailable, Judge Robert Miller, United States district judge for the Northern District of Indiana writes, "although the Indiana courts never formally overruled the requirement of unavailability, the requirement was not enforced in recent years." 13 Robert Lowell Miller, Jr., *Indiana Practice* 207 (1994 Supp.).

witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term 'business' as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit."

To lay a proper foundation for the business-record exception under the federal rules, the proponent must establish that: 1) the record pertains to a regularly conducted business activity; 2) it is the regular practice of the business activity to make the report; 3) the record was made at or near the time of the occurrence recorded; and 4) the record is based upon information transmitted by a person with knowledge. *Waddell v. C.I.R.* (1988) 9th Cir., 841 F.2d 264; *Pieters v. B-Right Trucking, Inc.* (1987) N.D.Ind., 669 F.Supp. 1463.

■ As to the first requirement, Williams does not challenge that the financial statements pertain to the beauty parlor or that the beauty parlor is a regularly conducted business activity.

Williams argues that the financial statements cannot be admitted as records of the beauty parlor because they were not prepared by an employee of A Step Ahead. This argument is a challenge the second requirement of admissibility. Here, the second requirement is met because testimony showed that it was the regular practice of the beauty shop to have the financial reports prepared by Dezelan. Although the record was not created by an employee of the business, as is the usual case, this does not bar its admission as a record of the beauty parlor itself. Audit reports prepared by an independent accountant are generally held to meet the requirements of Fed.R.Evid. 803(6) as a business record of the requesting business.[2] *Paddack v. Dave Christensen, Inc.* (1984) 9th Cir., 745 F.2d 1254; *In re Beverage Transport Inc.* (1980) W.D.N.Y., 2 B.R. 367; 4 Jack B. Weinstein and Margaret A.

Berger, *Weinstein's Evidence* ¶ 803(6)[2] (1984).

Business records are an exception to the hearsay rule because they are imbued with independent indicia of trustworthiness. These indicia are that the business establishes a routine of record-making, that the record is made by one with a duty to report accurately, and that the business relies upon that record in carrying out its activities. The fact that the business record is prepared by a party independent of the business does not negate these factors.

In *United States v. Ullrich*, the Don Kremer Lincoln Mercury dealership introduced into evidence an inventory schedule prepared by Ford Motor Credit Company which listed the cars on the dealership's lot. (1978) 5th Cir., 580 F.2d 765. The trial court overruled the opposing party's objection that the schedule was inadmissible because it was not prepared by the dealership, holding that the schedule had become a business record of the dealership. *Id.* at 767. The court based its holding upon the fact that the dealership integrated the schedule into its own records and relied upon the schedule to calculate the amount of interest owed to Ford and to determine which cars had been sold or sent to other dealerships. *Id.* In *United States v. Flom* (1977) 5th Cir., 558 F.2d 1179, the court held that invoices prepared by another business and forwarded to Florida Steel Corporation, were admissible as business records of Florida Steel Corporation. And in *United States v. Licavoli*, the Ninth Circuit admitted an appraisal of a stolen painting as a business record of an insurance company even though the appraisal was done by an independent expert hired by the insurance company. (1979) 604 F.2d 613, *cert. denied* (1980) 446 U.S. 935, 100 S.Ct. 2151, 64 L.Ed.2d 787.

Brown testified that it was the regular practice of the beauty parlor to have Dezelan prepare financial statements for the beauty parlor. Brown began using Dezelan in 1986 to prepare a year-end statement, and in the

---

**2.** Indiana has long admitted the opinions of independent accountants who have examined the books, records, papers, and files of a business. *Hollingsworth v. State* (1887) 111 Ind. 289, 12 N.E. 490; *The Equitable Accident Insurance Company v. Stout* (1893) 135 Ind. 444, 33 N.E. 623; *Chicago, St.L. & P. R.R. v. Wolcott* (1895) 141 Ind. 267, 39 N.E. 451.

years 1987 and 1988, Brown used Dezelan to prepare quarterly financial reports and year-end financial statements. Brown further testified that the financial statements were used to determine the business partnership's quarterly and year-end taxes. The beauty parlor's reliance upon the statements to file tax forms is affirmative evidence of the statements' reliability. It was in the beauty parlor's interest to value the business at no more than it was worth in order to avoid greater tax liability. These facts support a finding by the trial judge that the financial statements prepared by Dezelan were prepared as a regular practice of the beauty parlor.

As to the third requirement, there was sufficient evidence for the trial judge to find that the record was made at or near the time of the recorded transaction. Brown testified that the employees met every week to report their weekly income and turn in their receipts. Brown kept track of expenses and wrote out the checks for the shop's bills and employee salaries. Brown turned in the records of these weekly meetings to Dezelan on a monthly basis, along with the records pertaining to expenses. Dezelan used these reports to compute financial statements which were submitted to the beauty parlor on a quarterly basis. These facts show that the records upon which the exhibits were based were made at or near the time of the business transaction and that Dezelan's reports were made at or near the time that Brown transmitted information to him.

Finally, the financial statements meet the fourth requirement of personal knowledge, even though they were created by a party independent from the beauty shop. Where the initial informant has personal knowledge of a fact, that fact may be repeated by an infinite number of people as long as each person in the chain is acting in the regular course of business.[3] *United States v. Ahrens* (1976) 8th Cir., 530 F.2d 781. The recorders themselves need not have first-hand knowledge. *Id.* at 784. In federal courts, accountants are deemed to be acting in the regular course of business when preparing financial

statements. "'An accountant ... may be regarded as a member of a well adjusted business machine; noting, in the proper time, and in the proper way, what it is his duty to note.... the inference is that what he does in this way he does accurately....'" *Culver v. Marks* (1889) 122 Ind. 554, 565, 23 N.E. 1086, *quoting* 1 Wharton, *Law of Evidence* § 238 (3d Ed.).

The financial records were created by Brown, in part based upon information supplied to her by fellow employees. Each employee kept track of her own customers and the services supplied by them; therefore, when they reported this information, they had personal knowledge of it. These employees were acting in the regular course of business when they reported the information to Brown. Brown was acting in the regular course of business when she incorporated these statements into the beauty shop's records along with her own statements. Brown testified that she paid Dezelan as a part of the beauty shop's regular accounting services. In *In re Beverage Transport Inc., supra,* the court found that the accountant was acting in the regular course of business because he was hired "from time to time" to do accounting work for the requesting business. 2 B.R. at 369. Here, the evidence shows that Dezelan was used more than "from time to time" and, in fact, played an integral part in keeping the beauty parlor's business records. Dezelan was acting in the regular scope of business when he incorporated the beauty shop's financial records into quarterly and year-end summaries. "Although a financial statement audit is based in part on hearsay, it is generally admissible as a business record of the audited entity under Fed.R.Evid. 803(6)." *Paddack, supra,* 745 F.2d at 1257.

The trial judge did not err in finding that Dezelan's reports carried the requisite guarantees of trustworthiness.

### B. *Authentication*

■ Neither is it necessary for the preparing party, here Dezelan, to lay the foun-

---

3. Indiana has recognized this principle in slightly different terms with its requirement that the reporting party have a duty to record accurately. *Jones v. Marengo State Bank* (1988) 1st Dist.Ind.

App., 526 N.E.2d 709. Indiana has held that an accountant does have a duty to record accurately. *Culver v. Marks* (1889) 122 Ind. 554, 565, 23 N.E. 1086.

dation for the record; Brown's testimony alone is adequate to establish a foundation. Fed.R.Evid. 803(6) provides that business records must be introduced by the custodian or "other qualified witness." (West's Ind. Rules of Court (1993)). In attempting to encourage the admissibility of relevant and trustworthy evidence, "'the phrase 'other qualified witness' should be given the broadest interpretation....'" *In re Beverage Transport Inc., supra*, 2 B.R. at 369, *quoting Weinstein, supra*, at 803–178. "Although the usual case involves an employee of the preparing business laying the necessary foundation under 803(6), the law is clear that under circumstances which demonstrate trustworthiness [,] it is not necessary that the one who kept the record, or even had supervision over their preparation, testify...." *United States v. Flom* (1977) 558 F.2d 1179, 1182 (citations omitted). "[T]here is no requirement that the party offering a business record produce the author of the item." *In re Garm* (1990) M.D.Penns., 114 B.R. 414, 417. This expansive definition of an authenticating witness is also recognized in Indiana. The sponsor of a business record "need not have personally made it, filed it, or have firsthand knowledge of the transaction represented by it." *Boarman v. State* (1987) Ind., 509 N.E.2d 177, 181.

In *Flom, supra*, invoices were prepared by another business and then forwarded to Florida Steel Corporation, where they were held in the regular course of Florida Steel's business. The preparing corporation did not testify regarding the invoices, but the court admitted them based upon testimony of Florida Steel's employee. 558 F.2d at 1182. And in *Ullrich, supra*, the court admitted the inventory based on the testimony of a dealership employee, not Ford, the preparing entity. 580 F.2d at 771. In *Boarman*, the court admitted a card bearing the defendant's fingerprints, although the authenticating witness was not the officer who actually took the fingerprints. 509 N.E.2d at 181. Although Dezelan did not authenticate the record, the trial court did not err in finding that Brown could do so.

An alternate basis for finding Brown's testimony sufficient foundation for Dezelan's report is Fed.R.Evid. 901. This rule provides that a document may be authenticated if there is sufficient evidence to support a finding that the document is what the proponent says it is. "A judge, therefore, has some discretion to admit the statements of nonparticipants in the regular [business] activity if the facts 'remove any taint or unreliability.'" *Weinstein, supra*, at 803–192, *quoting* from *Ullrich, supra* at 772. In *Ullrich*, the court found that the dealership's testimony was sufficient to authenticate the inventory schedule, holding that it had all of the requisite indicia of trustworthiness since it was relied upon by the dealership in the regular course of its business. 580 F.2d at 772.

Whether a document has been properly authenticated is within the discretion of the trial judge. *Boarman, supra*, at 181. The trial judge did not abuse his discretion in finding that Brown was qualified to introduce the financial statements prepared by Dezelan.

## II. *Jury Instruction*

■ Williams argues that the trial court erred in refusing to give Final Instruction No. 14, which reads as follows:

"A sublessee is one who rents space from another individual or group when that individual or group is in turn renting from another individual. In this case, there was no written permission from the Defendant for the Plaintiff[s] to sublease any portion of the premises to another individual. This is not in dispute. Therefore, if you find that the Plaintiffs did sublease to other individuals then you must find that the Plaintiffs have breached the contract and are not entitled to any damages they may claim from their own breach of the lease. Those damages being any rents or income from sublessees and is [sic] not recoverable." Record at 223.

In his appellate brief, Williams contends that the issue of whether Hittle and Brown sublet a portion of A Step Ahead "constituted a material portion of [his] counterclaim". Brief of Appellant at 29. A review of the counterclaim reveals otherwise.

Williams' counterclaim rested upon the contentions that Hittle and Brown wrongfully

vacated the building in December of 1988, thus breaching the lease and that he was unable to re-rent the premises for the duration of the lease period. Thus, the success of Williams' counterclaim depended first upon prevailing upon the question of whether Hittle and Brown were legally justified in leaving the building prior to the expiration of the lease period.

The structure of this lawsuit was finalized by the pleadings and the evidence. Refusing to give Instruction No. 14 had no bearing upon whether Hittle and Brown left with good cause, or whether Williams was entitled to damages in the event of a finding that the Lessees left without good cause. Even assuming, arguendo, that there was a breach of the clause prohibiting sub-leasing, it was at most a technical breach that was not an issue in this lawsuit. Inasmuch as it pertained to an issue not relevant in the instant controversy, the trial court did not commit reversible error in refusing the instruction. *Gurczak v. Hutter* (1963) 136 Ind.App. 156, 188 N.E.2d 549, *trans. denied*, (1964) 245 Ind. 324, 198 N.E.2d 610.

### III. *Williams' Liability*

■ Williams contends that the jury finding of liability against him was unsupported by the evidence.

Under the terms of the lease, Williams was obligated to repair "[t]he exterior and structural walls (excluding storefronts, doors and glass) structural floors (excluding floor coverings), foundations, roofs, gutters, and exterior downspouts...." Record at 329. The Lessees maintained that Williams failed to keep the roof in repair, and that such failure resulted in leaking and structural damage to the interior of the building so severe in nature that they were forced to vacate the building. Thus, Hittle and Brown sought recovery upon the theory of constructive eviction.

■ The first allegation of error in this regard is that there was insufficient evidence to support a finding of constructive eviction. Constructive eviction occurs when "an act or omission by the lessor materially deprives the lessee of the beneficial use or enjoyment of the leased property...." *Sigsbee v.*

*Swathwood* (1981) 3d Dist.Ind.App., 419 N.E.2d 789, 794. In support of their claim, Hittle and Brown testified that Williams hired a local man who performed repairs upon the roof after the storm. Following the repairs, water continued to leak into the building after virtually every rainfall or snow melt. Upon each such occasion, Williams was informed of the problem and promised to effect repairs. Eventually, Hittle and Brown were forced to move their equipment into different areas of their salon in order to avoid areas of water leakage. They began arriving early at their salon each morning in order to have sufficient time to clean up any damage that may have occurred overnight as a result of leakage. Finally, at least two of their customers were struck by ceiling tiles which fell as a result of leaking water. There was also evidence from which the jury could conclude that the condition of the premises caused their business to decline. All the while, according to the testimony of Hittle and Brown, Williams was apprised of the situation and offered assurances that he would remedy the problem. There is sufficient evidence to support the conclusion that Williams breached his duty to maintain and repair the roof and that such breach effected a constructive eviction upon Hittle and Brown.

■ Williams argues in the alternative that even if the evidence was sufficient to support a finding of breach of the duty to repair, there was no evidence to support the award of $30,000 in damages. He argues, in effect, that upon a finding of constructive eviction, the only available relief for Hittle and Brown is that they may avoid the obligation to pay rent for the remainder of the lease period.

In support of his contention, Williams cites *Sigsbee, supra*, 419 N.E.2d 789. In *Sigsbee*, the lessees conducted a grocery business in a rented building. As a result of, among other things, a roof leak, the lessees abandoned the premises and sued the lessor for breaching the lease by failing to repair the roof. The lessees were awarded $4,000 upon a finding that they rightfully abandoned the store by virtue of the lessor's breach of the lease. The $4,000 award was primarily compensa-

tion for lost income. Our Third District reversed the award upon its conclusion that the lessees wrongfully abandoned the premises. *Sigsbee* therefore does not directly address the damages available upon a finding of constructive eviction. Moreover, to the extent that the subject is mentioned, *Sigsbee* does not support Williams' contention in this regard.

The court stated that "[i]ndirect injury resulting from [breach of the covenant to maintain the walls and roof] may be recovered as consequential damages." 419 N.E.2d at 797. Our research reveals no case indicating that the above quote from *Sigsbee* is incorrect with respect to permissible damages in a constructive eviction action. As in other contract actions, upon a finding of injury suffered as a consequence of breach of a duty to repair, a party may recover consequential damages.

 Ordinarily, the proper measure of damages for loss of use of property is the fair rental value of the property during the time that the injury existed. *Jay Clutter Custom Digging v. English* (1979) 181 Ind.App. 603, 393 N.E.2d 230. However, lost profits may be used as a measure of damages where such are appropriate and ascertainable with a reasonable degree of certainty. *Wolff v. Slusher* (1974) 161 Ind.App. 182, 314 N.E.2d 758. This is especially so when the aggrieved party is an established business:

> "[W]here the loss of the use of property involves a known and established business, the value of such loss of the use of the property may be determined from the loss of profit if such profits can be shown with a reasonable degree of certainty." *Maddox v. Yocum* (1944) 114 Ind.App. 390, 52 N.E.2d 636.

A Step Ahead opened for business in January 1987 and operated continuously until December 1988, except for a brief period immediately following the December 15, 1987 storm that originally damaged the roof. Hittle and Brown introduced the aforementioned financial records reflecting the partnership's profits for 1987, and for each quarter of 1988.

Those statements reveal that the partnership realized a net profit of $11,561.65 in 1987, and that amount increased to $31,296.15 in 1988. From this, the jury could reasonably have concluded that Hittle and Brown suffered a business loss in 1989 (the remainder of the lease period) roughly equivalent to the amount of net profit realized in 1988.

We conclude that the award was supported by evidence showing with a reasonable degree of certainty the amount of lost profit resulting from the closing of the partnership business. *See Maddox, supra* (court affirmed an award of damages based upon lost profits upon evidence comprised of business records covering a sixteen-month period prior to the breach).

## IV. *Counterclaim*

 Williams argues that the verdict against him upon his counterclaim was against the weight of the evidence. Williams' counterclaim essentially was that the Lessees breached the lease by wrongfully vacating the building, and that he was entitled to collect damages in the amount of the unpaid rent from the time they vacated the building until the termination of the lease.

In order to succeed upon his counterclaim, it was necessary that Williams prevail upon the issue of whether Hittle and Brown were justified in vacating the premises. The jury determined that they were justified in vacating, and we have previously concluded that said determination did not constitute error. Thus, the jury's determination that Williams should not prevail upon his counterclaim was not erroneous.

The judgment of the trial court is affirmed.

SHIELDS[4] and BARTEAU, JJ., concur.

---

4. Judge Shields concurred in this opinion prior to her departure from this court on January 28, 1994.