FLEMING, Adm'r of Wage and Hour Division, U. S. Dept. of Labor, v, JACKSON-VILLE PAPER CO. et al.

JACKSONVILLE PAPER CO. et al. v. FLEMING, Adm'r of Wage and Hour Division, U. S. Dept. of Labor.
No. 10118.

Circuit Court of Appeals, Fifth Circuit.
May 25, 1942.

Irving J. Levy and Mortimer B. Wolf, Asst. Sols., U. S. Dept. of Labor, and Abner Brodie, Principal Atty., U. S. Dept. of Labor, all of Washington, D. C., Chas. H. Spitz, Atty., U. S. Dept. of Labor, of Jacksonville, Fla., and Geo. A. Downing, Regional Atty., U. S. Dept. of Labor, of Atlanta, Ga., for appellant.

Louis Kurz and Reuben Ragland, both of Jacksonville, Fla., for Jacksonville Paper Co. et al.

Before SIBLEY, HOLMES, and McCORD, Circuit Judges.

SIBLEY, Circuit Judge.

The Jacksonville Paper Company is a very large wholesale distributor of paper and paper products whose main office and warehouse are in Jacksonville, Florida, but which maintains branch warehouses in twelve other cities in Florida and in two other States. Some of the products it sells are manufactured in Florida by a partnership composed of certain of its officers and stockholders and known as Southern Industries Company. But most of them it purchases in States other than Florida for shipment by boat, rail, or truck across State lines to the various warehouses. The employees of Jacksonville Paper Company order these goods, keep the books concerning them, and make payment for them, and also haul them in from the wharves or freight depots, and unload the freight cars and trucks which bring them to the several warehouses. After sale to the customers the goods are delivered by Jacksonville Paper Company's trucks. Frequently goods have been resold before they are ordered, and are intended for and presently delivered to these very customers. Quite often they are specially manufactured for such customers, and bear their names. Often, too, they are trucked to customers direct from the wharf or freight car without being deposited in the warehouses. But stocks of merchandise are regularly maintained in the warehouses and the major part of the goods handled are deposited there for a greater or less time until resold or ordered out. At some of the warehouses the sales out are all within the State. At others sales are made across State lines. Practically the entire production of Southern Industries Company is taken by Jacksonville Paper Company, and a large part is thus shipped regularly interstate to the warehouses outside Florida.

Warehouses and factory were all inspected by the Wage and Hour Administrator in December, 1939, and January, 1940, and he concluded all had employees engaged in commerce within Sections 6 and 7 of the Fair Labor Standards Act, 29 U. S.C.A. §§ 206, 207, with which there was not compliance. Southern Industries Company and five of the warehouses, which were selling interstate, were conceded to have employees protected under the Act, but it is claimed they have observed it since April 27, 1940. On July 8, 1940, however, the Administrator filed suit to restrain violations against Jacksonville Paper Company and Southern Industries Company. The court granted an injunction against the latter, and against the former as to the warehouses which sold interstate, but refused it as to the other warehouses, and gave judgment for costs equally divided. Both sides appeal.

It will be helpful first to notice some general principles. Sections 6 and 7 of the Act deal with an "employee who is engaged in commerce or in the production of goods for commerce." It is the employment of the particular employee and not the business of the employer, which is to be regarded. Yet the two are closely related, because the employee's work cannot be in commerce unless the employer's business is to that extent in commerce. On the other hand, the employer may be largely engaged in commerce, but the particular employee, engaged in some other work, may not be. The percentage of the employer's business intrastate as compared with that interstate proves little. The question must be whether the work of the particular employee for the time in question is in commerce or in the production of goods for commerce. His whole time and work need not be thus in commerce, because the Act does not make any distinction of that sort. If a substantial part of his work is in commerce

or in producing goods for commerce, he must be dealt with according to the Act. And "commerce" must not be limited to "transportation". Section 3, 29 U.S.C.A. § 203, which is the dictionary of the Act, declares that "Commerce means trade, commerce, transportation, transmission, or communication" interstate. Transportation is only a part of it. Trade is another part, and according to the old maxim, it takes two to make a trade. Importer as well exporter, buyer as well as seller, is a participant; and ordering and paying for goods are included. If across State lines all those engaged in such work are in commerce. The Act, Sect. 13(a) (2), 29 U.S.C.A. § 213(a) (2), excepts employees in a retail or service establishment the greater part of whose selling is in intrastate commerce, so that all employees of these are under or not under the Act. A wholesaler like Jacksonville Paper Company is not included in this exception, and must pay its employees who are employed in any phase of commerce according to the Act, although all its sales may be made intrastate.

▮ There can be no hard and fast line drawn between the employees at one of these warehouses and those at another. The employees who work exclusively in intrastate business at any of them are not under the Act. Those who work either at selling or delivering across State lines, or at buying and receiving across State lines, are employed in commerce, whether they write the letters, keep the books, or load and unload or drive the trucks. As we understand the record, some of this is done at every warehouse. The unloading at destination of an interstate shipment is work in interstate transportation, whether done by the carrier or another. Baltimore & O. S. W. R. R. v. Burtch, 263 U.S. 540, 44 S.Ct. 165, 68 L.Ed. 433; Puget Sound Stevedoring Co. v. Tax Commission, 302 U.S. 90, 58 S.Ct. 72, 82 L.Ed. 68. And the purchase of goods to be transported across State lines is interstate commerce as truly as the transportation itself. Currin v. Wallace, 306 U.S. 1, and cases cited on page 10, 59 S.Ct. 379, 83 L.Ed. 441.

▮ Without reviewing the multitude of decided cases as to when interstate trans-

portation ends,[1] we are justified in holding that after imported goods are delivered to and received by the importer, and become part of his property held within the State subject to his disposition, whether in the original containers or not, the subsequent sale and delivery of them within the State is intrastate commerce. The typical case is a stock of goods in a warehouse awaiting sales. It does not matter that the goods were imported with a view to selling them afterwards to particular customers, or that according to past experience they would likely be sold to them, or would surely be sold to someone very soon. If they come to rest in the hands of the importer, they have ceased to be in interstate commerce because of their importation, and his employees thereafter engaging solely in selling them within the State are not employed in interstate commerce.

▮ There are, however, border line distinctions. Where Jacksonville Paper Company takes an order from a customer for goods and purchases them in another State to fill that order, and they are shipped interstate with the definite intention that those goods be carried at once to that customer, and they are so carried, the whole movement is interstate, and the fact that title may have passed during transit, or that vehicles may have been changed, will not prevent the entire work of delivery to their final destination being an employment in commerce. Where, however, the purpose to deliver particular goods to fill a particular precedent order arises only after the goods come to rest at their originally intended destination, the new intrastate transportation afterwards underaken will not be a part of the original interstate movement, and employees aiding only the intrastate movement are not thereby employed in commerce under the Act.

We therefore do not agree with the District Court that a line can be drawn between all the employees at one warehouse and all those at another. Nor do we agree with the Administrator that all employees at all the warehouses are necessarily under the Act because the goods they handle were imported for sale.[2] The employment of each employee must be looked to, where-

---

[1] See 11 Am.Jur., Commerce, especially §§ 43, 45, 62, 63, 64, 66, 69, 71, 74.

[2] We so held in Jax Beer Co. v. Redfern, 5 Cir., 124 F.2d 172, and Swift & Co. v. Wilkerson, 5 Cir., 124 F.2d 176.

ever he may work, to see whether a substantial part of his work during the wage period is in commerce, or not. We think it likely that it will appear that some employees at every warehouse are employed in commerce, and the Administrator in that event will be entitled to declaratory or other relief covering such employees at all the warehouses.

 Southern Industries Company as to its employees producing goods for commerce and Jacksonville Paper Company as to those warehouses where employees are conceded to be employed in commerce, say that relief by injunction ought not to be granted because violations of the Act had ceased at latest by April 27, 1940, about six weeks before the suit was filed, and because an injunction will not issue to prevent that which is not threatened or has ceased; citing Industrial Ass'n v. United States, 268 U.S. 64, 84, 45 S.Ct. 403, 69 L.Ed. 849; United States v. United States Steel Corp., 251 U.S. 417, 444, 40 S.Ct. 293, 64 L.Ed. 343, 8 A.L.R. 1121; Blease v. Safety Transit Co., 4 Cir., 50 F.2d 852, 856; Champion Spark Plug Co. v. Reich, 8 Cir., 121 F.2d 769. The Administrator points to Sect. 17 of the Act, 29 U.S.C.A. § 217 giving the court jurisdiction "for cause shown * * * to restrain violations," and to such cases as United States v. Trans-Missouri Freight Ass'n, 166 U.S. 290, 309, 17 S.Ct. 540, 41 L.Ed. 1007; Federal Trade Commission v. Goodyear Co., 304 U.S. 257, 259, 260, 58 S.Ct. 863, 82 L.Ed. 1326; National Labor Relations Board v. Pennsylvania Greyhound Lines, 303 U.S. 261, 271, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307; and he contends that injunctions to establish public rights stand on a different footing from those in private matters. We are of opinion that Section 17 gives jurisdiction to grant but does not require in every case the grant of an injunction. Injunction is here, as it usually is, in the discretion of the court. This case is not one where the violations were dead issues at the filing of the suit; nor was cessation entirely voluntary, but was the result of recent official pressure. And Jacksonville Paper Company and the Administrator were still at serious issue as to some applications of the law. The District Court refused to hear evidence as to violations between April 27, 1940, and the filing of the suit. We think it would have been in order to hear whether the violations were continuing and whether if they had ceased there was no purpose to renew them; but it is clear there had been recent violations, and there was still contention, and this was enough to ground the grant of injunction upon.

 It was error, however, to grant an injunction as broadly as was done, for it reads: "from violating any of the provisions of the Fair Labor Standards Act of 1938." Such an injunction would put the defendants in contempt of court if thereafter in any way they violated this law, whereas it should have been restricted to a repetition of such violations as were found to have been committed, and similar ones. New York, New Haven & H. R. Co. v. Interstate Commerce Commission, 200 U.S. 361, 362, 404, 26 S.Ct. 272, 50 L.Ed. 515. A limited injunction was also granted, but as to Jacksonville Paper Company it refers to employees at named warehouses and offices only.

We need not pass upon the question whether the judgment for divided costs is good as against the Administrator, who asserts he stands as the United States in being immune against costs, for we shall reverse the judgment on the grounds above discussed, and this question is not likely to recur in the case.

We do not undertake to frame a decree appropriate to the whole situation, thinking it can best be done with the aid of counsel in the court below. We therefore reverse the judgment and remand the cause for such modification of the findings as ought to be made and a new decree in accordance with this opinion.