UNITED STATES of America, Plaintiff-Appellee,

v.

Edward L. FLOM, David L. Hoffman, Frank W. Hunsberger, and Richard E. Volland, Defendants-Appellants.

No. 76–1892.

United States Court of Appeals, Fifth Circuit.

Sept. 8, 1977.

Chester Bedell, John A. DeVault, III, Jacksonville, Fla., for Flom.

Ralph C. Dell, Tampa, Fla., for Hunsberger.

Manuel M. Garcia, Tampa, Fla., for Hoffman.

C. Lawrence Stagg, Tampa, Fla., for Volland.

Barry Grossman, Chief, Donald I. Baker, Asst. Atty. Gen., Catherine G. O'Sullivan, Atty., Appellate Section, Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before JONES, COLEMAN and TJOFLAT, Circuit Judges.

COLEMAN, Circuit Judge.

Appellants were convicted of violating Section One of the Sherman Act[1] by conspiring to allocate among the companies with whom they were connected contracts for sales of re-inforcing steel bars to construction contractors. They were sentenced to pay fines of varying amounts.

Because the jury was erroneously instructed and because the government was allowed to depart unfairly from its bill of particulars to the obvious prejudice of the defendants, we reverse and remand for a new trial.

I

At one time during the period of the alleged conspiracy, all appellants were officers of three companies[2] in the business of

---

1. 15 U.S.C., § 1.

2. The appellants' employers, Bethlehem Steel Corporation, of Bethlehem, Pennsylvania, Lac-

fabricating and selling reinforcing steel bars, generally known as re-bars, for use in a wide range of Florida construction projects utilizing concrete. The customers were large and small private contractors working in both the private and public sectors. The steel bars were manufactured in rolling mills outside the state. From there they were regularly shipped to the defendant companies, where the product was fabricated according to the needs of the particular purchaser.

There was evidence on behalf of the government that appellants, along with un-indicted representatives of other competing companies, met on a regular basis for the purpose of discussing various market factors of common interest. In these meetings, they allocated the business on upcoming construction contracts among their respective companies.

The agreed practice was that the selected winner would complete its estimate on the re-bars for that particular job. Through a member acting as an informational clearing house, the co-conspirators would be informed of the price below which they were not to bid. When the job was let, a complimentary bid, or no bid at all, would be submitted by the designated "losing bidders".

## II

Appellants raise five principal issues:

1. That the trial court erred in permitting the government to introduce evidence of specific allocated contracts after the government represented at pre-trial hearings, and in its bill of particulars, that it did not intend to prove at trial any specific contract, or, in lieu of excluding the evidence, either requiring an amendment to the bill of particulars prior to the government's presenting such evidence or granting the defense a ten day continuance to prepare;

2. That the evidence was insufficient to prove the jurisdictional requirement of interstate commerce, and that the Court incorrectly instructed the jury on that issue;

3. That the Court erred in treating the offense charged as a "per se" violation of the Sherman Act, i. e. as a matter of law an unreasonable restraint on interstate commerce;

4. That the indictment was insufficient;

5. A new trial should have been granted due to various evidentiary rulings of the District Court.

## III

Disposing of the fourth and fifth issues initially, before discussing those more difficult, we find that the trial court correctly found the indictment to be sufficient and was within its discretion in its evidentiary rulings.

Appellants claim error in the admission, Fed.R. of Evid. 803(6), of invoices received and held by defendant Flom's company (Florida Steel Corporation) in its regular course of business, but which were prepared and sent by another company. Foundation testimony was offered. through an official of Florida Steel Corporation that the invoices were received and held in the regular course of business. No testimony of the preparing company was offered. Although the usual case involves an employee of the preparing business laying the necessary foundation under 803(6), the law is clear that under circumstances which demonstrate trustworthiness it is not necessary that the one who kept the record, or even had supervision over their preparation, testify, *United States v. Pfeiffer*, 8 Cir., 1976, 539 F.2d 668; *United States v. Whitehouse Plastics*, 5 Cir., 1974, 501 F.2d 692. That the trial judge has a broad zone of discretion in evidentiary matters is a basic principle recently reiterated by this Court in *United States v. Miller*, 5 Cir., 1974, 500

lede Steel Company of St. Louis, Missouri, Florida Steel Corporation, of Tampa, Florida, were also charged in the indictment and entered pleas of nolo contendere. So did Owen

Steel Company, of Jacksonville, Florida. The sales involved took place in the State of Florida.

F.2d 751, *reversed on other grounds* 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976). The court below did not cross the line in finding that the foundation required by the Federal Rules of Evidence was supplied by the witness testifying at trial.

■ Likewise we find no merit in appellants' argument that the indictment was insufficient because it failed to enunciate with specificity the contracts allocated. The heart of a Section One violation is the agreement to restrain; no overt act, no actual implementation of the agreement is necessary to constitute an offense, *Nash v. United States*, 229 U.S. 373, 33 S.Ct. 780, 57 L.Ed. 1232 (1913). The indictment need not allege, nor the proof show, a specific contract.

### IV

■ The trial court was correct in holding that a contract allocation scheme in interstate commerce is a *per se* violation of the Sherman Act. Conspiracies between firms to submit collusive, non-competitive, rigged bids are *per se* violations of the statute, *United States v. Finis P. Ernest, Inc.*, 7 Cir., 1975, 509 F.2d 1256, *cert. denied*, 423 U.S. 874 and 893, 96 S.Ct. 142 and 191, 46 L.Ed.2d 105 and 124 (1975). An agreement that one company would not submit a bid lower than another is price fixing of the simplest kind and is a *per se* violation, *United States v. Bensinger Company*, 8 Cir., 1970, 430 F.2d 584. An agreement to "fix prices, *allocate customers*, rig bids, and coerce [others] to join the conspiracy" violated the Act (emphasis added), *United States v. Pennsylvania Refuse Removal Association*, 3 Cir., 1966, 357 F.2d 806, *cert. denied*, 384 U.S. 961, 86 S.Ct. 1588, 16 L.Ed.2d 674 (1966).

### V

On the jurisdictional issue the government acknowledged (Brief, p. 47) that it "relied on the 'flow of commerce' theory in this case, arguing that re-bar materials move in a continuous flow from steel mills outside Florida through the fabri-

cating and warehousing facilities of the defendant corporations to the contractors."

### VI

In 1942, the Fifth Circuit decided *Jacksonville Paper Company v. Fleming*, 128 F.2d 395. The case involved goods which had been warehoused only—no processing or alteration. It was held:

"Without reviewing the multitude of decided cases as to when interstate transportation ends, we are justified in holding that after imported goods are delivered to and received by the importer, and become part of his property held within the State subject to his disposition, whether in the original containers or not, the subsequent sale and delivery of them within the State is intrastate commerce. The typical case is a stock of goods in a warehouse awaiting sales. It does not matter that the goods were imported with a view to selling them afterwards to particular customers, or that according to past experience they would likely be sold to them, or would surely be sold to someone very soon. If they come to rest in the hands of the importer, they have ceased to be in interstate commerce . . . . [Footnote omitted].

"There are, however, border line distinctions. Where *Jacksonville Paper Company* takes an order from a customer for goods and purchases them in another State to fill that order, and they are shipped interstate with the definite intention that those goods be carried at once to that customer, and they are so carried, the whole movement is interstate, and the fact that title may have passed during transit, or that vehicles may have been changed, will not prevent the entire work of delivery to their final destination being an employment in commerce. Where, however, the purpose to deliver particular goods to fill a particular precedent order arises only after the goods come to rest at their originally intended destination, the new intrastate transportation afterwards undertaken will not be

a part of the original interstate movement . . . ."
128 F.2d at 398.

When the case came to the Supreme Court, styled *Walling v. Jacksonville Paper Company*,[3] the High Tribunal found it advisable to make some clarifying modifications:

"No ritual of placing goods in a warehouse can be allowed to defeat that purpose. The entry of the goods into the warehouse interrupts but does not necessarily terminate their interstate journey.

\* \* \* \* \* \*

"If there is a practical continuity of movement from the manufacturers or suppliers without the state, through respondent's warehouse and on to customers whose prior orders or contracts are being filled, the interstate journey is not ended by reason of a temporary holding of the goods at the warehouse."
63 S.Ct. at 335, 336.

The Supreme Court said that with these modifications the decision of the Circuit Court of Appeals stated "the correct view of the law".[4]

Appellants vigorously insist that *Walling* dictates a judgment of acquittal in their favor.

In *Foremost Dairies, Inc. v. Federal Trade Commission*, 5 Cir., 1965, 348 F.2d 674, *cert. denied* 382 U.S. 959, 86 S.Ct. 435, 15 L.Ed.2d 362, a Federal Trade Commission price discrimination case, milk passed in a steady flow from farms in Colorado through a Santa Fe processing plant to retail grocery shelves in Albuquerque. The Court held that there had been a continuous flow in interstate commerce from origin to the ultimate destination, but it twice pointed out that the processing operation "was

rather negligible" and did not appreciably change the character of the milk; moreover, the processed milk "was not warehoused for any appreciable length of time before shipment", 348 F.2d at 677, 678.

We construe this to indicate a different result if the processing operation had been substantial or if there had been an appreciable change in the character of the milk or if the milk had been warehoused for an appreciable length of time before shipment.

■ We think that the existence or nonexistence of any of these factors in any particular case, as well as whether the flow "stopped" before it reached the ultimate consumer, are for the resolution of a properly instructed jury, see *Northern California Pharmaceutical Association v. United States*, 9 Cir., 1962, 306 F.2d 379, 387, *cert. denied*, 371 U.S. 862, 83 S.Ct. 119, 9 L.Ed.2d 99; *Las Vegas Merchant Plumbers Association v. United States*, 9 Cir., 1954, 210 F.2d 732, 745, *cert. denied*, 348 U.S. 817, 75 S.Ct. 29, 99 L.Ed. 645.

On the issue of judgments of acquittal we are thus relegated to a consideration of whether under the evidence as heard no reasonably minded jury, properly instructed, could rationally have found that the "flow of commerce" which began at the mills outside Florida continued thereafter until the fabricated bars were delivered to the job sites of the ultimate purchasers, *United States v. Markham*, 5 Cir., 1976, 537 F.2d 187, 194.

■ On the jurisdictional issue candor compels us to say that this was an extremely close case, so close that it necessitated prolonged evaluation, indeed several reevaluations, of the evidence. Applying *Markham* standards, however, we are unable to say that the defendants were enti-

---

**3.** 317 U.S. 564, 63 S.Ct. 332, 336, 87 L.Ed. 460 (1943).

**4.** The Court added an explanatory warning:
"We do not mean to imply that a wholesaler's course of business based on anticipation of needs of specific customers, rather than on prior orders or contracts, might not at times be sufficient to establish that practical continuity in transit necessary to keep a move-

ment of goods 'in commerce' within the meaning of the Act. It was said in *Swift & Co. v. United States*, 196 U.S. 375, 398, 25 S.Ct. 276, 280, 49 L.Ed. 518, that 'commerce among the states is not a technical legal conception, but a practical one drawn from the course of business.' "
63 S.Ct. at 336.

tled to judgments of acquittal, although we came remarkably close to reaching that conclusion. Upon a retrial of this case the point deserves the intense attention of court and counsel. Upon a retrial our holding at this juncture on this issue is not intended to be an announcement of "the law of the case".

## VII

Of one thing, however, we are entirely confident. These convictions must be reversed because the jury, under the facts, was erroneously instructed.

The appellants preserved their objections to the following instruction:

"Even though it [the commodity] may be stored temporarily in route or at the destination while awaiting sale or in circumstances where it is altered or mixed with other materials and re-sold as a manufactured product, a commodity moving in interstate commerce from sources outside the state in which the alleged restraint occurred does not necessarily lose its interstate character. This is a question for you to determine from all the evidence.

"If you find from the evidence beyond a reasonable doubt that any one or more of the companies involved in the alleged conspiracy, to-wit, Bethlehem Steel Corporation, Florida Steel Corporation, Laclede Steel Company, or Owen Steel Company of Florida, within the period covered by the indictment, *regularly received shipments of re-bar steel from sources outside the state of Florida for fabrication and resale in the State of Florida, then you may find the continuous stream or flow of such interstate commerce as charged in the indictment.* It is for you, the jury, to determine whether the evidence established, beyond a reasonable doubt, such a continuous stream or flow in interstate commerce.

"If you do not find proof of a continuous flow in interstate commerce, then you should acquit the Defendants."

[Italics ours].

Under the facts this was an erroneous statement of the law (see italicized portion, *ante*) because it told the jury that mere "receipt" of the bars was enough to establish the required flow of interstate commerce.

It also amounted to a directed verdict of guilty because it told the jury that its verdict should turn on an undisputed fact, standing in isolation.

It presented the government's theory of the case but it ignored the defense raised by the appellants and, in effect, foreclosed it. A defendant is always entitled to have his theory of the case, if it could amount to a lawful defense, fairly submitted to the consideration of the jury. That did not happen here. The jury should have been told that before reaching the ultimate answer of guilt or innocence as to the conspiracy it had first to find beyond a reasonable doubt, upon a consideration of the factors herein discussed, that the fabrication and sale of the steel bars to Florida purchasers, occurred in the "flow" of interstate commerce as herein defined, with the contentions of the defense set in proper perspective.

The case must be reversed and remanded so that in a new trial the jury will be correctly and adequately instructed for both the government and the defense.

## VIII

The parties have vigorously argued another very serious point with reference to the failure of the government to abide by the bill of particulars which it had "voluntarily" filed in response to a motion for a bill. Whether the government "had to" file the bill or not, it chose to do so, and the defendants were entitled to rely on it until validly amended. There is no question that the government flagrantly departed from the unambiguous statement of the bill that no evidence of particular contracts would be offered because it had no such evidence in its possession. On the basis of a pre-trial telephone call, the contents of which are bitterly disputed, the government seeks to excuse the incident. We might

observe that telephone calls are no way to amend bills of particulars; certainly not where, as here, the changes were not thereafter clarified on the record in open court before the trial begins before the jury. Indeed, counsel for the prosecution sat mute while counsel for the defense made an opening statement to the jury in which he materially relied on the contents of the "voluntary" bill of particulars, only to be confronted later with the offer and admission of the evidence over objection. With no notice in writing or in open court before the jury entered the picture, this maneuver was basically unfair and highly prejudicial. In the absence of curative action it cannot and will not be countenanced, more especially in a criminal prosecution. The trial court denied defense motions for a mistrial and for other curative action, including a recess to allow time to prepare a response for the unexpected development. This was error.

The Judgment of the District Court is reversed and the case is remanded for a new trial.

REVERSED and REMANDED.