**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Robert Laverne BOOTY, Defendant-Appellant.**

**No. 79–5237.**

United States Court of Appeals, Fifth Circuit.

July 21, 1980.

James A. McPherson, New Orleans, La., for defendant-appellant.

John P. Volz, U.S. Atty., Ronald A. Fonseca, Asst. U.S. Atty., New Orleans, La., for plaintiff-appellee.

Before THORNBERRY, FRANK M. JOHNSON, Jr. and HENDERSON, Circuit Judges.

FRANK M. JOHNSON, Jr., Circuit Judge:

This is a direct appeal from a conviction for conspiracy to commit mail fraud against or otherwise defraud the United states in violation of 18 U.S.C. § 371 [1]. The defendant, Robert Laverne Booty, challenges the sufficiency of the evidence on which he was convicted and the correctness of a number of the trial court's evidentiary rulings and instructions to the jury. His contentions have no merit, and we affirm the conviction.

## I.

The undisputed factual background is as follows. Booty and his business partner, Clyde Smoak, owned and operated the Southeastern Paving Company, Inc., and the Louisiana Southern Construction Company. In 1972, in the name of Southeastern Paving, Booty and Smoak applied for and obtained a Small Business Administration guaranteed loan of $140,000. The loan was made by a local Amite, Louisiana, bank of which Booty was a director. One of the conditions of the loan was that Booty and Smoak assign to the bank insurance policies on their lives in the amount of $70,000 each, $140,000 in total.[2] In the spring of 1975, in the name of Louisiana Southern Construction, Booty and Smoak obtained another SBA guaranteed loan of $350,000 from the same bank. One of the conditions of this loan was that Booty and Smoak assign to the bank insurance policies on their lives in the amount of $160,000 each, $320,000 in total.[3] For each of the loans, Booty and Smoak signed agreements with the SBA warranting, among other things, that they would maintain payments on the life insurance until the loans were fully repaid [4] and that they would obtain the consent of the

---

1. 18 U.S.C. § 371 provides:

   If two or more persons conspire either to commit any offense against the United states, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

   If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor.

   Booty was charged and convicted of conspiring in violation of this statute to commit mail fraud against the United States, as proscribed by 18 U.S.C. § 1341, or more generally, to defraud the United States "in any manner or for any purpose," as proscribed by § 371 itself. See Dennis v. United States, 384 U.S. 855, 861, 86 S.Ct. 1840, 1844, 16 L.Ed.2d 973 (1966) (§ 371 "reaches 'any conspiracy for the purpose of impairing, obstructing or defeating the lawful function of any department of Government' ").

   Although the style of Booty's indictment cited 18 U.S.C. § 2 in addition to 18 U.S.C. § 371, implying that Booty was charged not only with conspiracy in violation of § 371 but also with aiding and abetting such a conspiracy, 18 U.S.C. § 2, see, e.g., United States v. Lane, 514 F.2d 22, 24 (9th Cir. 1975) (prosecution for aiding and abetting a conspiracy to distribute and possess cocaine), the record indicates that a § 2 charge was never put before the jury. The body of the indictment, the bill of particulars, the government's argument at trial, and the court's instructions to the jury dealt only with the § 371 charge. Cf. United States v. Alvarez, 610 F.2d 1250, 1257 (5th Cir. 1980), rehearing en banc granted, id. at 1258 (attempting to implicate a defendant in a conspiracy by charging that he aided and abetted the conspiracy is a "route, seldom used"). See also United States v. Bullock, 451 F.2d 884, 888 (5th Cir. 1971).

2. Condition "(6)" of the 1972 "Loan conditions required by Lender and SBA" was: "Assignment of insurance on the life of Clyde Donald Smoak in the amount of $70,000.00 and insurance on the life of Robert Laverne Booty in the amount of $70,000.00. This coverage can be the declining or mortgage type insurance."

3. Condition "(6)" of the 1975 "Loan conditions required by Lender and SBA" was: "Assignment of life insurance on Clyde D. Smoak and Robert L. Booty each in the amount of $160,000 (which shall be decreasing term)."

4. The agreements provided:

   5. *Payment of Life Insurance Premiums.*—Borrower agrees, with respect to any life insurance assigned or which may be required to be assigned or pledged as collateral

SBA in writing prior to assuming or otherwise suffering any encumbrance upon it.[5] In August 1975, Southeastern Paving and Louisiana Southern Construction ceased doing business. At the time, neither Smoak nor Booty had assigned any life insurance to the bank.[6] The 1972 loan became past due in June 1975; the 1975 loan, made in April 1975, became past due in December 1975.

In September 1975, Booty approached P.A. Roth, Jr., a close business associate of Booty[7] and the chief executive officer of the lender bank, and showed him two insurance policies on the life of Clyde Smoak naming Booty as beneficiary.[8] The face amount of the policies was $150,000. Booty told Roth that he could not afford the $534 monthly premiums. He asked Roth if he knew anyone who would be willing to pay the premiums in exchange for a share of the proceeds of the policies. Roth told Booty that he did not but that he thought that he could convince the the bank to agree to continue payment of the premiums if Booty would agree to assign the policies to the bank. After some initial hesitation, Booty agreed to this proposal.[9] Roth reported to Booty at a later meeting that he had obtained the permission of the bank board of directors.[10] Booty and Roth then sent a letter to Booty's insurance agent, signed by Booty and dated October 5, 1975, notifying the agent of the assignment.[11] Booty gave

for the Loan, that it will at all times, while said Loan or any part thereof remains unpaid, promptly pay or cause to be paid any and all premiums or charges due or payable upon or on account of any such policy or policies so assigned or pledged, and will at all times, while said Loan or any part thereof remains unpaid, maintain and continue such policy or policies in full force and effect, and will take any and all action necessary or required by Lender or by the company or companies issuing any such policy or policies to complete, perfect and preserve the rights of the insured or beneficiary to the end that any such policy or policies will not lapse or be subject to any claim whatsoever. In the event Borrower fails to pay any such premiums when due, Lender may advance the amount necessary to pay such premiums and add the amount so advanced to the principal indebtedness owing on account of the Loan.

5. The agreements provided:
9. Borrower will not, without the prior written consent of Lender and SBA create, assume or otherwise suffer to exist any mortgage, pledge or other incumbrance upon any of the real or tangible personal property of the Undersigned, whether now owned or hereafter acquired, except (a) liens for taxes or other governmental charges not delinquent or being contested in good faith, or (b) purchase money liens upon property acquired after the date of the Note, and other liens upon such property at the time of the acquisition thereof.

6. There was testimony that the bank on its own had obtained $20,000 of insurance for the 1972 loan.

7. According to Roth, he and Booty had been involved in a number of business deals unconnected to the bank, e.g., a sugar mill venture.

8. The policies had been obtained by Booty in 1974 at approximately the same time Smoak had obtained a similar amount of insurance on the life of Booty. The partners allegedly acquired this insurance in contemplation of a "buy-sell agreement" into which they planned to enter, its purpose being to provide a surviving partner funds with which to buy out the heirs of the other in the event one of them died. The insurance Smoak held on Booty lapsed in September 1975 for non-payment of premiums.

9. According to Roth, Booty said he was reluctant to assign the policies to the bank because "he would be cleaned out all his assets and everything that he owned when we foreclosed on him and he said he would rather just let the policies lapse." Roth testified that Booty did not want the SBA to receive any part of the insurance proceeds "because he felt like he had taken a beating, that they had cleaned him out of everything that he had, as I recall him saying."

10. According to the minutes of the September 25, 1975 meeting of the bank's loan committee:
Mr. Roth reported to the Committee that he was holding an insurance policy of $150,000.00 on the life of Mr. C.D. Smoak. He said that the premiums were $514.00 per month and requested permission from the Committee to continue payments. After a short discussion, it was moved by Mrs. Cefalu and seconded by Mr. Ardillo that payment of premiums on the policy continue until further action by the Board. The motion carried unanimously.

11. The letter, which was drafted by Roth, was as follows:

October 5, 1975

Mr. John Rosata
Agent

Roth the policies and the bank began paying the premiums.

At the time these arrangements were made it was apparently known that Smoak's death was imminent.[12] Smoak died on November 9, 1975, and on November 11 Booty's insurance agent came by the bank and picked up the policies. The agent informed Roth at that time, as he had earlier, that the insurance company would not recognize the assignment of the policies to the bank until Booty completed certain company forms. Although Roth then, as before, instructed Booty to complete the forms, and Booty promised Roth that he would do so, he never did. In December 1975, Booty, a lawyer representing Booty, and the insurance agent travelled to the insurance company headquarters in Dallas and picked up checks for the $150,000 in proceeds from the policies. The checks were then exchanged for a cashier's check from a Dallas bank. The next day, Booty, two lawyers representing Booty, and Roth travelled to New Orleans to cash the check. They obtained the $150,000 in cash in hundred dollar bills, placed the money in two brief cases, and carried it back to the Amite bank. There, Booty gave Roth $5,000 for his personal use and transferred most of the rest to a safe deposit box, opened in Booty's name and access to which was personally controlled by Roth. Roth kept all records of the box in his desk drawer.[13] Over the course of the next three months, Booty withdrew approximately $15,000. In late February 1976, Roth told Booty that the bank wanted $45,000 of the cash. Roth told Booty that this was the amount the bank stood to lose on the 1972 and 1975 SBA loans. Booty removed the remaining cash from the safe deposit box, paid the bank $15,000 of it and kept the rest. He told Roth to keep a $30,000 check the bank was holding for him—proceeds from the sale of certain bank stock Booty had owned—to make up the rest of the $45,000.

Approximately a week later, Roth, as president of the bank, sent a letter to the SBA requesting the agency to honor its guaranty agreement and send a check to the bank for the guaranteed portion of the balance past due on each of the Booty loans. The letter noted that certain collections had already been made and credited to the loan accounts, indicated that the bank was holding a number of mortgages for the loans on which it had yet to foreclose, and promised that the bank would continue to service the loans in an effort to collect more of the outstanding balance. No mention was made of the Smoak life insurance proceeds or of the $45,000 recently received from Booty.[14] Two weeks later, the SBA wrote

---

Southwestern Life Insurance Company
Hammond, Louisiana

Re: Policy # 1645378
and 1659313
Clyde D. Smoak

Dear John:

In consideration for extending credit to me, I shall appreciate if you would change ownership of the above captioned policies to Central Progressive Bank of Amite, Louisiana. They will continue to send in the monthly premiums due on the policies.

Thank you for your assistance in this matter.

Sincerely,
Robert L. Booty

Roth testified at trial that before Booty signed this letter, Roth attempted to have him sign a letter starting that the policies would be assigned to the bank for the purpose of covering the bank's projected $45,000 non-SBA-guaranteed loss on the 1972 and 1975 loans. Roth testified that Booty refused, saying that the letter was not what he and Roth had agreed to. According to the government, this testimony contradicted what Roth had earlier told

government investigators and the grand jury, viz., that there had been only one letter. After being shown a copy of his grand jury testimony, Roth testified that the fact that there had been two letters was something he had only just remembered.

**12.** Booty states in his brief that "[t]he physical condition of Mr. Smoak must have been well known to appellant, who wanted to keep the policies in force rather than letting them lapse for non-payment of premiums, and to Mr. Roth, as well, who wanted the bank to take over paying the premiums in order to reap the benefits of those policies when Mr. Smoak died."

**13.** Roth testified that this was not normal bank practice.

**14.** As reported by Booty in his brief:

. . . Mr. Roth did not advise the SBA that the bank had received the $45,000.00. Mr. Roth never told the SBA during the time the money was in the bank that it was there. The letter made demand on [the] SBA for its share of the guaranteed balances of $74,-

Roth that the agency's checks for the guaranteed portion of the loan balances were, as requested, on their way. Noting that the bank would retain servicing of the loans, the SBA asked Roth to "[p]lease attempt to work out an orderly means of liquidation with the signers of the Note. If orderly liquidation cannot be arranged, a decision will be made whether or not to institute suit and judgment proceedings."

Approximately a month later, in late April 1976, the bank underwent a Federal Deposit Insurance Corporation audit. In the midst of this audit Roth made entries in the bank's records for the first time reflecting the receipt of the $45,000 from Booty. According to the auditor, the entries were improperly made. Although notations on the entries indicated that the $45,000 had been received in connection with Booty's SBA loans, the $45,000 was credited not to a reduction of the loan balances, but to two bank income accounts to which the SBA was not privy. The auditor asked Roth to explain the entries but was rebuffed.

In early May 1976, shortly after the audit had begun, Roth and Booty met with an SBA loan officer to discuss the status of the loan. Roth informed the agency for the first time of the $15,000 in cash he had received from Booty in late February. Roth also told the SBA officer that Booty

had some bank stock which would be sold and applied to the loan. Neither he nor Booty disclosed to the agency the source of the $15,000 or otherwise mentioned the Smoak life insurance proceeds.

Approximately a week later, Roth resigned his position with the bank. *See* note 25, *infra.* One month after his resignation, during a weekend in June, he convinced a bank officer to allow him into the bank building in order to dictate a letter to the SBA. A bank secretary typed and mailed the letter shortly thereafter on June 22, 1976, but, pursuant to Roth's instructions, backdated it to May 13, 1976.[15] The letter informed the SBA that the bank had received $15,000 in cash from Booty and $30,-000 in cash from the sale of Booty's stock. It did not mention the Smoak insurance proceeds.

At no time during this entire period did Roth or Booty bring the insurance proceeds to the SBA's attention.[16]

In December 1978, Booty was indicted on two counts of misapplication of bank funds in violation of 18 U.S.C. § 656.[17] That indictment, later dismissed on the government's motion, was superseded by an indictment charging Booty with conspiracy to commit mail fraud against or otherwise defraud the United States in violation of 18 U.S.C. § 371.[18] At the close of a two day

000.00 and $191[,]994.00 on the two loans. The $45,000.00 was not reflected in the balances referred to in the letters.
(Citations to record omitted.)

**15.** The letter purported to respond to a telephone conversation of May 6, 1976, during which the chief of the portfolio management division of the SBA's New Orleans office had apparently asked Roth for a written report on the status of the recoveries on Booty's SBA loans.

**16.** The record indicates that, at most, Roth mentioned to an SBA official prior to Smoak's death that Booty was holding insurance on Smoak's life. The SBA official Roth identified testified that to his knowledge Roth had made no such disclosure.

At trial, Roth explained his silence as follows:

. . . what you do is nothing, you don't do anything you don't tell [the SBA] you have it, you don't tell them you don't have it because they don't check on it. It's a closed case, you never hear from them again, they

don't want to be bothered about it. If you don't say anything you, in effect, retain [the money] . . . .

**17.** The bank funds allegedly misapplied, $1,068 in total, were the funds used by the bank to pay the Smoak insurance premiums for the two months prior to Smoak's death.

**18.** *See* note 1, *supra.* Booty was the only conspirator charged. *See United States v. Klein,* 560 F.2d 1236, 1242 (5th Cir. 1977), *cert. denied,* 434 U.S. 1073, 98 S.Ct. 1259, 55 L.Ed.2d 777 (1978) (not necessary, to sustain conviction for conspiracy, that co-conspirators be charged); *Ng Pui Yu v. United States,* 352 F.2d 626, 633 (9th Cir. 1965) (same).

According to the government, Roth had previously pled guilty to criminal charges stemming from unrelated other events at the bank, and was granted immunity in the Booty case in exchange for his testimony. The government maintains, without contradiction, that this arrangement was adequately disclosed. *See Williams v. Brown,* 609 F.2d 216, 221 (5th Cir.

trial, a jury found Booty guilty and he was sentenced to 18 months in prison.

## II.

Booty's principal contention is that there was insufficient evidence to support his conviction. He claims that the trial court erred in denying his motion for acquittal, made at the conclusion of the government's case. This contention has no merit.

■ Since Booty presented evidence in his own behalf following denial of the motion and did not renew the motion at the close of all the evidence, this Court's review of the evidence is limited to a determination of whether there has been a 'manifest miscarriage of justice.' *See United States v. White*, 611 F.2d 531, 536 (5th Cir. 1980); *United States v. Bourg*, 598 F.2d 445, 448 (5th Cir. 1979); *United States v. Phipps*, 543 F.2d 576, 577 (5th Cir. 1976), *cert. denied*, 429 U.S. 1110, 97 S.Ct. 1146, 51 L.Ed.2d 564 (1977). *See also United States v. Sander*, 615 F.2d 215, 218 (5th Cir. 1980). When viewed in the light most favorable to the verdict with all reasonable inferences and credibility choices made to support the verdict, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), the evidence in this case establishes that no miscarriage of justice has occurred.

■ Booty's argument is that the evidence shows that it would have been impossible for him to defraud the SBA because the SBA had no legal right to the insurance proceeds.[19] Even assuming that this is what the evidence shows,[20] the argument misses the point. Possibility of success is not a requisite element of a criminal conspiracy under 18 U.S.C. § 371. All the statute requires is that two or more persons conspire to commit an offense against or otherwise defraud the United States and that one or more of such persons do an act in pursuit of that objective. 18 U.S.C. § 371, *quoted in* note 1, *supra*. *See, e. g., Iannelli v. United States*, 420 U.S. 770, 777, 95 S.Ct. 1284, 1289, 43 L.Ed.2d 616 (1975); *United States v. Romeros*, 600 F.2d 1104, 1105–06 (5th Cir. 1979), *cert. denied*, —— U.S. ——, 100 S.Ct. 1025, 62 L.Ed.2d 759 (1980). *See also Osborn v. United States*, 385 U.S. 323, 332–33, 87 S.Ct. 429, 434, 17 L.Ed.2d 394 (1966) ('impossibility' no defense to prosecution for 'endeavor[ing]' to influence a juror in violation of 18 U.S.C. § 1503).[21] Here there was sufficient evi-

1980); *United States v. Crockett*, 534 F.2d 589, 603 (5th Cir. 1976). *See generally United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

**19.** Booty argues that the insurance policies were never assigned to the bank and that, as a result, the SBA never had any right to the proceeds, or, alternatively, that even if the policies had been assigned to the bank the SBA would have had no right to the proceeds.

**20.** The government maintains, contrary to Booty's contention, that the SBA did have a right to share in the Smoak insurance proceeds. The law and the facts indicate that the government has the better of the argument, but the issue is not before us and we see no point in discussing or deciding it.

**21.** Evidence showing that a particular § 371 conspiracy had no possibility of success—i. e., that it could not actually have defrauded the United States or resulted in the commission of an intended offense against the United States—would be relevant in evaluating a defendant's claim that he lacked the necessary criminal intent required by the statute, but only if it appeared or could reasonably be supposed that the defendant had been aware of and convinced by the evidence prior to his entanglement in the conspiracy. *See, e. g., United States v. Mardian*, 546 F.2d 973, 981–82 (D.C.Cir.1976).

In this case, Booty made no claim—nor, given the evidence, would one have appeared plausible—that in conducting his dealings with Roth he had believed that the SBA had no legal right to the insurance proceeds and thus could not have been defrauded. More specifically, he made no claim, much less any showing, that he had been aware of the Louisiana law of executory process. For this reason, the trial court properly refused on grounds of relevance Booty's attempt to introduce expert legal testimony to the effect that under Louisiana executory process law the SBA had by August or September 1975 forfeited any right it may have had to proceed against Booty's assets. *See also* note 20, *supra* (government contends that Booty misconstrues Louisiana law); *United States v. Evans*, 572 F.2d 455, 470–71 (5th Cir.), *cert. denied*, 439 U.S. 870, 99 S.Ct. 200, 58 L.Ed.2d 182 (1978) (as a general proposition, question of ownership of property which depends upon construction or existence of statute is a matter of law for determination by the court). For the same reason, the trial court also properly refused Booty's requested jury instructions on the Louisiana law of executory process. *See also* Fed.R.Crim.P. 30. Booty's claims of error in this regard have no merit.

dence from which to conclude, as the government contended, that Booty and Roth believed that the SBA had a valid claim to the insurance proceeds, and that as a result of this belief they conspired and acted to conceal the proceeds from the SBA. This was sufficient to establish a violation of the statute.

Essentially two challenges to this characterization of the evidence can be made out from Booty's brief, neither of which has any merit.

For one, Booty contends that although there may have been sufficient evidence to support a finding that Roth unlawfully concealed the insurance proceeds from the SBA, thus defrauding the United States and in the process committing mail fraud against the United States, there was no evidence from which to properly conclude that Booty was connected to this fraud by way of a conspiracy with Roth. As the facts set out in the first section of the opinion indicate, this contention is frivolous.

Booty also contends that the evidence established that he did not have the criminal intent to defraud or commit mail fraud against the United States requisite to liability under the statute. According to him, the evidence demonstrated that he believed that the SBA had a right to the insurance policies and proceeds, and could be defrauded by his dealings in their regard, *see* note 21, *supra,* only if he assigned the policies to the bank, and he had effectively resisted making such an assignment. As the facts set out in the first section of the opinion also indicate, this contention has no merit.

There clearly was sufficient evidence from which to conclude that Booty believed that the SBA had a right to the insurance proceeds even if the policies were never assigned to the bank. *See, e. g.,* notes 2–5, *supra.* There also clearly was sufficient evidence from which to conclude that Booty believed that he had effected, or at least believed that he had agreed to effect, an assignment of the policies to the bank.[22]

It may be noted that this is not a case in which the defendant's criminal intent is likely to have been inferred solely from acts consistent with a noncriminal enterprise, a practice condemned by this Circuit in prosecutions for criminal attempt. *See United States v. Oviedo,* 525 F.2d 881 (5th Cir. 1976); *United States v. Mandujano,* 499 F.2d 370 (5th Cir. 1974) (Rives, J.), *cert. denied,* 419 U.S. 1114, 95 S.Ct. 792, 42 L.Ed.2d 812 (1975). The actions taken by Booty in assigning the policies to the bank and in picking up and safeguarding the proceeds were hardly "so commonplace that they are engaged in by persons not in violation of the law." *United States v. Oviedo,* 525 F.2d at 885.[23]

### III.

Booty's remaining contentions involve alleged errors in the district court's evidentiary rulings and instructions to the jury.

▉ Booty claims that it was plain error for the trial court not to have instructed the jury *sua sponte* to consider only for its impeachment value and not as substantive evidence certain prior inconsistent grand jury testimony of Roth that the government referred to in its examination of Roth.[24] *See* Fed.R.Evid. 105 ("[w]hen evi-

---

**22.** Booty's brief can be read as making an alternative contention that the evidence can be held to show only that if Booty did assign or agree to assign the insurance policies to the bank, he did so only as consideration for another loan unrelated to the SBA loans and with no intention of defrauding the SBA. This contention is also without merit.

**23.** Booty's only explanation of these actions, or at least the only explanation he argued to the jury, was that they were undertaken simply to avoid, not the SBA, but a deficiency judgment held against Booty by a man named Anderson. It may be noted that this explanation was discredited by Booty's own witness. According to the witness' undisputed testimony, the Ander-

son deficiency judgment was only for $15,936.78 and had apparently been satisfied in September 1975 by the seizure and later sale of certain Booty-owned stock.

**24.** Roth surprised the government at trial with his testimony that Booty had refused to sign a letter to his insurance agent specifying that his reason for assigning the Smoak insurance policies to the bank was to help the bank cover its projected loss on the SBA loans. *See* note 11, *supra.* He testified in response to government questioning that he had not disclosed the event before because he either had not been asked about it or had only just remembered it. This testimony was allegedly inconsistent with statements Roth had earlier made to the grand

dence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly"); *United States v. Sisto*, 534 F.2d 616, 623–26 (5th Cir. 1976). This claim has no merit. Rule 105 calls for a limiting instruction only if the evidence complained of has been admitted. The grand jury testimony at issue here was never admitted. A copy of it was simply given to Roth in order to allow him to refresh his memory. *See* note 11, *supra*. Moreover, even assuming that the testimony had been admitted, the fact that it was grand jury testimony, given under oath subject to the penalty of perjury, would have made it proper under Fed.R.Evid. 801(d)(1)(A) for the jury to have considered it as substantive evidence. *See* 4 Weinstein's Evidence ¶ 801(d)(1)(A)[01]. Finally, even assuming that the testimony had been admitted and that it would have been improper for the jury to have considered it as substantive evidence, the nature of the testimony and the evidence in this case were such that the trial court's failure to *sua sponte* so instruct would not have been plain error. *See United States v. Garcia*, 530 F.2d 650, 654–56 (5th Cir. 1976) ("[p]lain error appears only when the impeaching testimony is extremely damaging, the need for the instruction is obvious, and the failure to give it is so prejudicial as to affect the substantial rights of the accused").

■ Booty next claims that the trial court erred in restricting his cross-examination of a bank official who testified for the government that he had allowed Roth into the bank in June 1976, that Roth had dictated a letter to the SBA, and that he thought that this letter had been typed, backdated pursuant to Roth's instructions, and mailed. *See supra*. On cross-examination, Booty asked the official if there had been a fight for controlling interest in the bank. The government objected to the question as being beyond the scope of its direct, and the objection was sustained. Booty contends that in sustaining the objection the trial court committed reversible error because the excluded evidence would have impeached the official's testimony by showing that the official was biased against Roth and Booty.[25] This contention, even if supported by the evidence, would not support a reversal. Even assuming that the excluded testimony would have shown that the official was biased against Roth and Booty, the bank official's testimony about the backdated letter merely corroborated earlier, uncontradicted testimony by Roth to the same effect. Even were we to conclude that the trial court's ruling was incorrect,[26] under the circumstances it could

jury, showing that Roth had been questioned on the subject and that he had not suggested, nor did his statements indicate, that his memory of the matter had been in any way deficient.

**25.** According to Booty,

Mr. Roth had testified that the Blossman interests had tried to take over the bank while he was there and that he resigned when those interests were nearly strong enough to fire him and barely failed in an effort to do so. Appellant had been a member of the Board of Directors who was opposed to the takeover by the Blossman interests and he subsequently sold his shares in the bank to a Board-owned agent, P. A. Roth, Agent, in order to avoid his shares falling into the hands of the Blossman interests if he kept them and they were subsequently seized in satisfaction of his then numerous debts to several litigating creditors.

Mr. William Clifton [the bank official] remained at the bank as an Assistant Vice President after the Blossman interests succeeded in its takeover of the bank.

Appellant wanted to show the bias and interest of this member of the opposing faction against both himself and Mr. Roth. (Citation to record omitted.)

**26.** *See* 3 Weinstein's Evidence ¶ 607[03], at 607–22 to 607–24 ("Relationships between a party and a witness are always relevant to a showing of bias whether the relationship is based on ties of family, sex—heterosexual or homosexual—employment, business, friendship, enmity or fear"). *See, e. g., Aetna Insurance Co, v. Paddock*, 301 F.2d 807, 812 (5th Cir. 1962) (action to reform insurance policy; error to exclude evidence that key witness for insured had borrowed money from insured to start his own insurance agency). *But see United States v. Diecidue*, 603 F.2d 535, 550 (5th Cir. 1979) ("extent of proof of bias is a matter reserved to the discretion of the trial judge and the judgment will be disturbed on review only where an abuse of that discretion is shown").

hardly constitute a ground for reversal. See Fed.R.Evid. 103(a) ("[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected . . .").

■ Booty's final claim is that the trial court committed plain error by not making its instructions to the jury "sufficiently explicit to hold the jury to convicting appellant of conspiracy only if it found him to have been in league with the only named co-conspirator, Mr. Roth." What he suggests is that the trial court's instructions, by making it possible for him to be convicted of an offense for which he was not indicted—Booty claims that he was indicted for conspiring with Roth but that the trial court's instructions allowed him to be convicted of conspiring with anyone—created a 'variance' that affected his substantial rights and entitles him to a new trial. See, e. g., Kotteakos v. United States, 328 U.S. 750, 757, 66 S.Ct. 1239, 1243, 90 L.Ed. 1557 (1946); Berger v. United States, 295 U.S. 78, 81–84, 55 S.Ct. 629, 630–31, 79 L.Ed. 1314 (1935). See also Dunn v. United States, 442 U.S. 100, 105–07, 99 S.Ct. 2190, 2193–94, 60 L.Ed.2d 743 (1979). ("To uphold a conviction on a charge that was neither alleged in an indictment nor presented to a jury at trial offends the most basic notions of due process. Few constitutional principles are more firmly established than a defendant's right to be heard on the specific charges of which he is accused."). This argument has no basis. Contrary to Booty's contention, the trial court's instructions did not expand on the indictment.[27] Even assuming that they had, it is plain that the discrepancy would not entitle Booty to relief. See Berger v. United States. 295 U.S. at 82, 55 S.Ct. at 630 (true inquiry is whether there has been such a variance as to 'affect the substantial rights' of the accused); United States v. Canales, 596

27. The indictment accused Booty of conspiring "with others known and unknown to the Grand Jury . . . ." The trial court's instructions to the jury were, in representative part, as follows:

What the evidence in the case must show beyond a reasonable doubt is: (1) That two or more persons in some way or manner, positively or tacitly, came to a mutual understanding to try to accomplish a common and unlawful plan, as charged in the indictment; (2) That the Defendant willfully became a member of such conspiracy; (3) That one of the conspirators during the existence of the conspiracy knowingly committed at least one of the means or methods or overt acts described in the indictment; and, finally, that such overt act was knowingly committed at or about the time alleged in an effort to effect or accomplish some object or purpose of the conspiracy.

Booty's only colorable claim to a variance is that the indictment was narrowed by the government's bill of particulars and that plain error resulted when the trial court failed to correspondingly narrow its charge. See, e. g., United States v. Flom, 558 F.2d 1179, 1185–86 (5th Cir. 1977) (where "no question that government flagrantly departed from the unambiguous statement of the bill [of particulars] . . . ," error for trial court to deny defense motions for mistrial and for other corrective action, including recess to allow time to prepare response). See also Fed.R.Crim.P. 7(f) (amendment of bill of particulars "subject to such conditions as justice requires"). But see United States v. Francisco, 575 F.2d 815, 819

(10th Cir. 1978) (interpreting Pipkin v. United States, 243 F.2d 491, 494 (5th Cir. 1957) as support for holding that bill of particulars does not limit indictment). In this case such a claim has nothing to commend it. The bill of particulars stated in pertinent part only that "[t]he only known co-conspirator of defendant, Robert Laverne Booty, at the present time is Philip A. Roth." This statement would seem sufficient to keep Booty on notice that other conspirators might be discovered later. Certainly Booty could not reasonably rely on it to conclude—as he contends now—that it limited the indictment to such an extent that he could later be convicted only of conspiring with Roth.

It should be noted that, Booty's intimations to the contrary notwithstanding, a conspiracy indictment and a conspiracy charge to a jury may properly refer to unidentified co-conspirators. See, e. g., Rogers v. United States, 340 U.S. 367, 375, 71 S.Ct. 438, 443, 95 L.Ed. 344 (1951) ("at least two persons are required to constitute a conspiracy, but the identity of the other members of the conspiracy is not needed, inasmuch as one person can be convicted on conspiring with persons whose names are unknown") (citations omitted); United States v. Goodwin, 492 F.2d 1141, 1144–45 (5th Cir. 1974); United States v. Monroe, 164 F.2d 471, 474–75 (2d Cir. 1947), cert. denied, 333 U.S. 828, 68 S.Ct. 452, 92 L.Ed. 1113 (1948). Cf. United States v. Pruett, 551 F.2d 1365, 1369 (5th Cir. 1977) ("evidence must support proposition that such a co-conspirator did exist and that the defendant did conspire with him").

F.2d 664, 671 (5th Cir. 1979) (citing cases).[28] As reflected in the indictment, the bill of particulars, and the government's argument and proof at trial, the theory on which this case was prosecuted, and the basis on which the jury presumably rendered its verdict, *see Dunn v. United States*, 442 U.S. at 106–07, 99 S.Ct. at 2194, was that Booty conspired with Roth. As we concluded above, this theory and verdict were adequately supported by the evidence.

The conviction is AFFIRMED.

---

**28.** A variance may affect a defendant's substantial rights by insufficiently informing him of the charges against him such that he is taken by surprise and prevented from making a proper defense, or by affording him insufficient protection against reprosecution for the same offense. *Berger v. United States*, 295 U.S. at 82, 55 S.Ct. at 630; *United States v. Lambert*, 501 F.2d 943, 947–48 & n. 7 (5th Cir. 1974) (en banc); *United States v. Juarez*, 573 F.2d 267, 278–79 (5th Cir.), *cert. denied*, 439 U.S. 915, 99 S.Ct. 289, 58 L.Ed.2d 262 (1978).